IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Freddie Owens,<br><br>　　　　PETITIONER<br><br>　　v.<br><br>Bryan P. Stirling, *Commissioner, South Carolina Department of Corrections*; Willie D. Davis, *Warden, Kirkland Correctional Institution*,<br><br>　　　　RESPONDENTS | Case No. 0:16-cv-02512-TLW<br><br><br><br>**Order** |

This is a capital habeas corpus action brought pursuant to 28 U.S.C. § 2254 by Petitioner Freddie Owens against Respondents Bryan P. Stirling and Willie D. Davis (collectively, the State). For the reasons set forth below, the Court grants the State's motion for summary judgment and denies Owens' habeas petition.

# I.　　Factual and Procedural History

## A.　　Trial and First Sentencing

Irene Graves was murdered on November 1, 1997 during an armed robbery of the Speedway convenience store where she worked in Greenville County, South Carolina. Owens was indicted in October 1998 for murder, armed robbery, possession of a firearm during the commission of a violent crime, and criminal conspiracy. He was represented by John M. Rollins Jr. and Karl B. Allen in a jury trial that began on February 8, 1999. The jury returned a guilty verdict on all counts.

During the trial's sentencing phase, after hearing evidence and argument, the jury returned a recommendation of death on the murder conviction, finding as an aggravating circumstance that

the murder was committed while in the commission of a robbery while armed with a deadly weapon. The presiding judge sentenced Owens to death for murder, thirty years consecutive for armed robbery, five years concurrent for possession of a weapon during a violent crime, and five years concurrent for criminal conspiracy.

## B.    First Direct Appeal

Owens timely appealed and was represented on appeal by Rollins, Allen, and Katherine Carruth Link, Assistant Appellate Defender with the South Carolina Office of Appellate Defense. On appeal, he raised issues relating to the trial court's jurisdiction, evidentiary rulings, the denial of a new trial, and sentencing. On September 4, 2001, the South Carolina Supreme Court affirmed his convictions, but vacated his sentence for possession of a firearm during commission of a violent crime, reversed his death sentence, and remanded for a new sentencing proceeding. *State v. Owens* (*Owens I*), 552 S.E.2d 745, 759–61 (S.C. 2001), *overruled on other grounds by State v. Gentry*, 610 S.E.2d 494 (S.C. 2005).

## C.    Second Sentencing

On remand, Owens was represented by Alex Kinlaw Jr. and Steve W. Sumner. At this sentencing, he waived his right to a jury and proceeded with a bench sentencing. After hearing evidence and argument, the presiding judge sentenced Owens to death.

## D.    Second Direct Appeal

Owens timely appealed and was represented on appeal by Joseph L. Savitz III, Acting Chief Attorney with the South Carolina Office of Appellate Defense. The sole issue on appeal involved the propriety of the circuit judge's colloquy with Owens regarding his jury waiver. On

December 20, 2004, the South Carolina Supreme Court again reversed his death sentence and remanded for a new sentencing proceeding. *State v. Owens* (*Owens II*), 607 S.E.2d 78, 80 (S.C. 2004).

## E. Third Sentencing

On remand, Owens was represented by Everett P. Godfrey Jr. and Kenneth C. Gibson.[1] This time, he proceeded before a jury, and after hearing evidence and argument, the jury returned a recommendation of death as to the murder conviction, finding as aggravating circumstances that the murder was committed while in the commission of a robbery while armed with a deadly weapon and that the murder was committed while in the commission of a larceny with the use of a deadly weapon. On November 11, 2006, the presiding judge once again sentenced Owens to death.

## F. Third Direct Appeal

Owens timely appealed and was represented on appeal by Savitz and LaNelle C. DuRant, both with the South Carolina Commission on Indigent Defense, Division of Appellate Defense. Appellate counsel raised the following issues:

1. The trial judge abused his discretion when he summarily disqualified a potential juror, Sonya Ables (Juror Number 1), solely because she "went to [her] pastor and talked to him about [the death penalty]," as he incorrectly believed "there is a case right on point, that if a woman talks to her priest after she's been called as a juror about capital punishment, she is disqualified under the law."

2. The trial judge committed reversible error by admitting Owens' prison disciplinary records, as they violated the rule against hearsay, as well as the

---

[1] The claims Owens raises in this habeas action all involve the third sentencing, so any references throughout this opinion to "sentencing counsel" refer to Godfrey and Gibson, unless otherwise noted.

Sixth and Fourteenth Amendments.

3.        The trial judge committed reversible error by allowing the Solicitor to argue in closing that the conditions of life imprisonment in general justified a death sentence for Owens, as this argument injected an arbitrary factor into the jury sentencing considerations in violation of S.C. Code Section 16-3-25(C)(1).

ECF No. 16-4 at 222. On July 14, 2008, the South Carolina Supreme Court affirmed his death sentence. *State v. Owens* (*Owens III*), 664 S.E.2d 80, 82 (S.C. 2008). He then submitted a petition for rehearing, which was denied.

After the denial of Owens' petition for rehearing, his new counsel, John H. Blume and Keir M. Weyble, filed a petition for a writ of certiorari from the United States Supreme Court. On January 21, 2009, the Supreme Court denied the petition. *Owens v. South Carolina*, 555 U.S. 1141 (2009).

### G.     First PCR Action

Owens then submitted a pro se petition for post-conviction relief (PCR) on January 29, 2009. Weyble and Emily C. Paavola were appointed to represent Owens in the PCR proceeding. They submitted on his behalf an amended petition and then a second amended petition raising the following claims:

10(a)     Applicant was denied the right to effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, §§ 3 and 14 of the South Carolina Constitution during jury selection at his 2006 capital re-sentencing proceeding.

11(a)     Supporting Facts: Trial counsel's performance during jury selection was both deficient and prejudicial. *See Strickland v. Washington*, 466 U.S. 668 (1984). Counsel's acts or omissions included the following:

1)        Counsel failed to object to statements by the solicitor, and similar instructions by the trial court, that the State may only seek death where aggravating circumstances are present, which improperly suggested to potential jurors that the aggravating circumstances had

4

already been found.

2)     Counsel failed to object when the trial judge erred by disqualifying a potential juror, Sonya Ables (Juror Number 1), solely because she "went to [her] pastor and talked to him about [the death penalty]," as the trial judge incorrectly believed "there is a case right on point, that if a woman talks to her priest after she's been called as a juror about capital punishment, she is disqualified under the law."

10(b)    Applicant was denied the right to effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, §§ 3 and 14 of the South Carolina Constitution, during his 2006 capital sentencing proceeding.

11(b)    Supporting Facts: Trial counsel's performance during jury selection was both deficient and prejudicial. *See Strickland v. Washington*, 466 U.S. 668 (1984). Counsel's acts or omissions included the following:

1)     Counsel failed to object and/or request proper instructions from the court when the State played a crime scene video without further explanation or analysis. *2006 Tr. at 1076*. The crime scene video shows two masked men, but their faces are not identifiable. One of the masked men is primarily shown in the video. He stands behind the counter, points a gun at the clerk, and appears to shoot the clerk before the two men run out of the convenience store. Applicant's codefendant, Steven Golden, testified at Applicant's previous trials that it was he (Golden) who is primarily visible in the video. The State then offered an analysis as to why it believed the fatal shot came from the other man standing off-camera. The jury at Applicant's 2006 resentencing heard no analysis about who appears in the video. They were simply instructed that Applicant had already been found guilty of murder, and then they were shown the video without explanation. The trial judge at the 2006 re-sentencing instructed the jurors that they could consider whether Applicant had "minor participation" in the crime as a mitigating circumstance. *2006 Tr. at 1592*. But, without further instruction, the video misled the jury to believe that there was conclusive video-graphic evidence that Applicant fired the fatal shot, thereby foreclosing consideration of both the "minor participation" mitigating circumstance, and the related possibility that Applicant, though perhaps present, had not been the triggerman.

2)     Counsel failed to object to improper and prejudicial opinion testimony from Officer Joe Wood that Applicant gave him "cold chills," and the solicitor's reliance on that testimony in closing argument. *2006 Tr. at 1093 and 1559*.

3)      Counsel failed to object to victim impact testimony regarding the effect of the victim's death on the victim outreach coordinator. *2006 Tr. at 1274*. Such testimony was outside the scope of proper victim impact evidence, and counsel's failure to lodge an appropriate objection was unreasonable and prejudicial. Counsel also failed to object to hearsay testimony from the victim outreach coordinator concerning statements that the victim's children made to her after the victim's death. *2006 Tr. at 1268-1271*. These statements violated the evidentiary rules of South Carolina, as well as the confrontation and the due process clauses of the state and federal constitutions.

4)      Counsel failed to preserve the state and federal constitutional issues related to the admission of a list of disciplinary infractions by failing to object on the basis of the Confrontation Clause and due process. On appeal, the South Carolina Supreme Court held that counsel's objection was inadequate to preserve the federal constitutional issues and thus, the issue was procedurally barred. *See State v. Stone*, 655 S.E.2d 487, 488-89 (S.C. 2007). Counsel's failure to lodge an appropriate objection was deficient and prejudicial.

5)      Counsel failed to present readily available mitigating evidence that had already been developed at Applicant's previous trial and first resentencing proceeding. Ms. Marjorie Hammock previously testified in much greater detail to Applicant's life history and background. Further, Dr. Jim Evans previously testified that Applicant has brain dysfunction and difficulties with attention and impulse control. Counsel failed to have Ms. Hammock testify to all of the details that were available concerning Applicant's life history, and counsel failed to call Dr. Evans to testify at all.

6)      Counsel failed to investigate and present mitigating evidence of Applicant's experiences while incarcerated in the Department of Juvenile Justice, and the impact of those experiences upon his character, conduct, and psychological condition.

7)      Counsel failed to ensure that jurors did not see Applicant in restraints.

8)      Counsel failed to object to the solicitor's improper and prejudicial closing argument. For example, counsel failed to object to the solicitor's statements that the prosecution seeks death only rarely, even in eligible cases, and this case was one of those rare cases: "Only limited circumstances are allowed for us to seek the death penalty, and rarely do we seek the death penalty in all those cases that are eligible. In only certain cases do we seek the death penalty." *2006 Tr. at 1552*; *see also*, *2006 Tr. at 1555* ("There are mean and

6

evil people in the world who do not deserve to continue to live with the rest of us, regardless of how confined they may be. The law limits the right to seek the death penalty to a very select number of cases, very few, and we seek the death penalty only in a few, but the circumstances where we seek it is available mean and evil people who commit atrocious acts of murder; the worst of the worst. That is what the death penalty is reserved for. Those whose behavior sets them apart even from the criminal world, and that is Freddie Owens, and this murder and his behavior are one of those cases"). Counsel further failed to object when the solicitor argued that the jury should sentence Applicant to death because his life would be easy in prison. *See, e.g.*, *2006 Tr. at 1561* ("[b]ig prison is like a little city. In prison he will have all the necessities in life. . . . He will have clothing that they provide, and he will have contact with his family, and TV at times, and he will have family business. Not much more than a change of address for Freddie Owens. So don't think putting Freddie Owens in prison for the rest of his life is going to be a significant punishment for him"). Counsel also failed to object when the solicitor told the jury that he personally wanted the death penalty and would not be "satisfied with a life sentence." *2006 Tr. at 1555*. Counsel thus failed to preserve for appeal whether the improper arguments violated the Sixth, Eighth and Fourteenth Amendments and the corresponding provisions of the South Carolina Constitution and South Carolina law, including S.C. Code Ann. § 16-3-25(C) (2003).

10(c)  Applicant's death sentence was obtained in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and the corresponding provisions of South Carolina law, because the jurors saw Applicant in restraints.

11(c)  The above ground states the relevant facts.

10(d)  Applicant was denied the right to effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, §§ 3 and 14 of the South Carolina Constitution, during the appellate phase of his 2006 re-sentencing proceeding.

11(d)  Supporting facts: Appellate counsel's performance on appeal was both deficient and prejudicial. *See Strickland v. Washington*, 466 U.S. 668 (1984); *Evitts v. Lucey*, 469 U.S. 387 (1985). Appellate counsel failed to assert that it was error for the trial court to deny Applicant's request to ask potential jurors if they would have a bias in favor of police officers because of their previous work in that field.

ECF Nos. 16-4 at 409, 16-5 at 1–6. After briefing and an evidentiary hearing, the PCR court

denied his petition on February 13, 2013. ECF No. 16-14 at 140–70. He then filed a motion to alter or amend, which was also denied.

## H.   First PCR Appeal

Owens, through Weyble and Paavola, then filed a petition for a writ of certiorari to the South Carolina Supreme Court, raising the following issues:

I.     Whether Petitioner's right to effective assistance of counsel was violated as a result of trial counsel's failure to investigate and present available and compelling mitigating evidence from Petitioner's entire life history?

II.    Whether Petitioner's right to effective assistance of counsel was violated as a result of trial counsel's failure to raise readily available challenges to a variety of evidence offered by the prosecution in support of its case for a sentence of death?

III.   Whether Petitioner's rights under the Eighth and Fourteenth Amendments and S.C. Code Ann. § 16-3-25(C)(1) were violated as a result of the prosecutions' improper closing argument and improper statements during jury selection, and whether Petitioner's right to effective assistance of counsel was violated as a result of trial counsel's failure to object to the same?

IV.    Whether Petitioner was prejudiced as a result of the cumulative effect of trial counsel's multiple deficient acts and omissions?

ECF No. 15-9 at 9. On June 17, 2015, the South Carolina Supreme Court denied his petition. He filed a petition for rehearing, which was also denied.

## I.   Federal Habeas Action

Owens commenced the instant action on July 27, 2015 by filing a motion for a stay of execution and a motion to appoint counsel. ECF No. 1. The Court stayed Owens' execution pending appointment of counsel and the filing of a habeas petition. ECF No. 9. On July 11, 2016, Owens' appointed counsel filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 83. The Court then stayed his execution pending resolution of his habeas petition. ECF

No. 100.  On September 8, 2016, he filed an amended petition.  ECF No. 117.  On October 18,

2016, the magistrate judge stayed the case pending resolution of a second PCR action that he filed

in state court.  ECF No. 124.

### J.    Second PCR Action

On July 20, 2016, shortly after Owens filed his federal habeas petition, he filed a second

PCR action in state court, raising the following claims:

(a)    Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to investigate, develop and present evidence of institutional negligence which would have mitigated the State's theory that the in-custody death of Mr. Lee conclusively established future dangerousness and the only sentencing option for the petitioner was death.  Evidence from expert witnesses available at the time of the petitioner's sentencing trial demonstrated that institutional negligence in failing to classify, and detain the petitioner in accordance with that classification, was the proximate cause of the death of Mr. Lee.  5th, 6th, 8th and 15th Amendments to the *Constitution of the United States of America*; *Skipper v South Carolina*, 476 US 1 (1986).

(b)    Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to investigate, develop and present objective and scientific evidence of structural and functional brain damage resulting from early childhood trauma and materially limiting the applicant's ability to make informed decisions, learn from past behavior, and control impulses resulting from recurrence of situation prompts in daily living which were the same or similar to those of his early childhood.  5th, 6th, 8th, and 14th Amendments to the *Constitution of the United States of America*; *Wiggins v Smith*, 539 US 510 (2003).

(c)    Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to investigate, develop and present objective and scientific evidence of structural and functional brain damage resulting from a history of epileptic grand mal seizures and its impact upon the applicant's cognitive functioning and resulting culpability for the crime of conviction. All in violation of the Fifth, Sixth, Eighth, Fourteenth Amendments to the Constitution of the United States of America; and clearly established federal law as announced by the Supreme Court of the United States in *Wiggins v Smith*, 539 US 510 (2003).

(d)    Trial and collateral counsel were ineffective to the prejudice of the applicant

by failing to object to the court's recurring jury charge that a finding of life without parole must be unanimous when that charge was not in the sentencing statute, was false, materially misleading, coercive, abusive and irrelevant to the sentencing function. (5th, 6th 8th and 14th Amendments to the *Constitution of the United States of America*; (*Winkler v South Carolina* not yet decided)

(e) Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to investigate, develop and present mitigation evidence that the applicant suffered from repeated early childhood trauma and sexual abuse. These abusive experiences resulted in organic brain injury, ambiguous sexual identity, and created within the applicant a sensitivity to common adult situational prompts that, in his case, lead to a recurrence of the earlier trauma and extreme preemptive fear aggression as the only behavioral response known to the applicant. 5th, 6th, 8th, and 14th Amendments to the *Constitution of the United States of America*; *Rompilla v Beard*, 545 US 374 (2005).

(f) Trial, direct appellate and collateral counsel were ineffective to the prejudice of the applicant by failing to include as reversible error an objection to the trial court's decision to allow testimony of in-custody administrative rules violations as aggravation evidence supporting a sentence of death when those violations were disproportionate to the crime for which the jury was sentencing the petitioner, did not result in injury, were in part administrative violations common to every inmate and were not characterological of the petitioner's propensity for future violence.

(g) Trial counsel duly requested that the State disclose all evidence which might be favorable to the defense. Nonetheless, the State failed to disclose evidence that impeaches material witnesses against the applicant in violation of the Fifth, Eighth and Fourteenth Amendments to the *Constitution of the United States of America*; *Brady v Maryland*, 373 US 83 (1963) and *Wearry v Cain*, 136 S. Ct. 1002 (2016). Collateral counsel were ineffective to the prejudice of the applicant in failing to recognize that the State did not disclose material items that would have substantially improved the mitigation case and changed cross-examination tactics had the materials been timely disclosed.

(h) Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to challenge the State's decision to seek the death penalty as the decision was motivated by arbitrary factors since the crime was disproportionate to the rare and exceptional case as required by the narrowing features of *Furman v Georgia* and *Gregg v Georgia* and the Fifth, Sixth, Eighth and Fourteenth Amendments to the *Constitution of the United States of America*.

ECF No. 113-1 at 4–5. The PCR court denied his petition on April 10, 2017. He did not file a

direct appeal.  *See* ECF No. 143.

## K.  Resumption of Federal Habeas Action

After being informed of the conclusion of Owens' second PCR action, the magistrate judge

lifted the stay in this case and briefing recommenced.  ECF No. 146.  In his amended petition, he

raises the following issues, quoted verbatim:

EXHAUSTED GROUNDS FOR FEDERAL HABEAS RELIEF

(1)    Trial counsel was ineffective at Petitioner's 2006 sentencing proceeding for failing to investigate and present available and compelling mitigating evidence.

(2)    Trial counsel was ineffective at Petitioner's 2006 sentencing proceeding for failing to object to the list of prison disciplinary infractions on Confrontation Clause and Due Process, Eighth Amendment and Proportionality Grounds.

(3)    Trial counsel was ineffective at Petitioner's 2006 sentencing proceeding for failing to object or request proper instructions from the court regarding the crime scene video.

(4)    Trial counsel was ineffective at Petitioner's 2006 sentencing proceeding for failing to object to irrelevant, inflammatory, and prejudicial testimony from both Officer Joe Wood, who testified Petitioner gave him "cold chills," and Juliana Christy, a victims' advocate who testified this case was "the hardest case she ever had to work on" in fifteen years at the Greenville County Sheriff's Department.

(5)    Petitioner's rights under the Eighth and Fourteenth Amendments were violated as a result of the prosecution's improper closing argument and improper statements during jury selection, and trial counsel was ineffective for failing to object to the same.

UNEXHAUSTED GROUNDS FOR FEDERAL HABEAS RELIEF
*Martinez v. Ryan*, 132 S. Ct. 1302 (2012)

(6)    Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to investigate, develop and present evidence of institutional negligence which would have mitigated the State's theory that the in-custody death of Mr. Lee conclusively established future dangerousness and the only sentencing option for the

petitioner was death.  Evidence from expert witnesses available at the time of the petitioner's sentencing trial demonstrated that institutional negligence in failing to classify, and detain the petitioner in accordance with that classification, was the proximate cause of the death of Mr. Lee.  5th, 6th, 8th and 14th Amendments to the *Constitution of the United States of America*; *Skipper v South Carolina*, 476 US 1 (1986).

(7)     Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to investigate, develop and present objective and scientific evidence of structural and functional brain damage resulting from early childhood trauma and materially limiting the applicant's ability to make informed decisions, learn from past behavior, and control impulses resulting from recurrence of situation prompts in daily living which were the same or similar to those of his early childhood.  5th, 6th, 8th, and 14th Amendments to the *Constitution of the United States of America*; *Wiggins v Smith*, 539 US 510 (2003).

(8)     Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to object to the court's recurring jury charge that a finding of life without parole must be unanimous when that charge was not in the sentencing statute, was false, materially misleading, coercive, abusive and irrelevant to the sentencing function.  (5th, 6th 8th and 14th Amendments to the *Constitution of the United States of America*; (*Winkler v South Carolina* not yet decided)

(9)     Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to investigate, develop and present mitigation evidence that the applicant suffered from repeated early childhood trauma and sexual abuse.  These abusive experiences resulted in organic brain injury, ambiguous sexual identity, and created within the applicant a sensitivity to common adult situational prompts that, in his case, lead to a recurrence of the earlier trauma and extreme preemptive fear aggression as the only behavioral response known to the applicant.   5th, 6th, 8th, and 14th Amendments to the *Constitution of the United States of America*; *Rompilla v Beard*, 545 US 374 (2005).

(10)    Trial, direct appellate and collateral counsel were ineffective to the prejudice of the applicant by failing to include as reversible error an objection to the trial court's decision to allow testimony of in-custody administrative rules violations as aggravation evidence supporting a sentence of death when those violations were disproportionate to the crime for which the jury was sentencing the petitioner, did not result in injury, were in part administrative violations common to every inmate and were not characterological

of the petitioner's propensity for future violence.

(11) Trial counsel duly requested that the State disclose all evidence which might be favorable to the defense. Nonetheless, the State failed to disclose evidence that impeaches material witnesses against the applicant in violation of the Fifth, Eighth and Fourteenth Amendments to the *Constitution of the United States of America*; *Brady v Maryland*, 373 US 83 (1963) and *Wearry v Cain*, 136 S. Ct. 1002 (2016). Collateral counsel were ineffective to the prejudice of the applicant in failing to recognize that the State did not disclose material items that would have substantially improved the mitigation case and changed cross-examination tactics had the materials been timely disclosed.

(12) Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to challenge the State's decision to seek the death penalty as the decision was motivated by arbitrary factors since the crime was disproportionate to the rare and exceptional case as required by the narrowing features of *Furman v Georgia* and *Gregg v Georgia* and the Fifth, Sixth, Eighth and Fourteenth Amendments to the *Constitution of the United States of America*.

ECF No. 117 at 6–7. The State filed a return to the amended petition and a second motion for summary judgment. ECF Nos. 147, 148. Owens filed a response in opposition to the summary judgment motion, ECF No. 174, and the State filed a reply, ECF No. 184.

On January 12, 2018, the magistrate judge issued a Report and Recommendation (R&R), in which she recommended granting the State's summary judgment motion and denying Owens' petition. ECF No. 193. Owens filed objections to the R&R, ECF No. 199, and the State filed a reply to those objections, ECF No. 202. Additionally, the State filed its own objections to the R&R,[2] ECF No. 198, and Owens filed a reply to those objections, ECF No. 201.

This matter is now ripe for decision.

---

[2] The State does not object to the R&R's ultimate conclusion and instead merely objects to the extent that there were additional facts and law that were not included in the R&R. Because the State does not object to the ultimate conclusion, the Court will not separately address those objections.

## II.     Standards of Review

### A.     Report and Recommendation

The magistrate judge issued her R&R in accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02(B)(2)(c) (D.S.C.).  The R&R is only a recommendation to the Court and has no presumptive weight.  The responsibility to make a final determination rests with the Court.  *See Mathews v. Weber*, 423 U.S. 261, 270–71 (1976).  The Court conducts a *de novo* determination of any portion of the R&R to which a specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the magistrate judge's recommendation, or may recommit the matter to the magistrate judge with instructions.  28 U.S.C. § 636(b)(1).  In the absence of an objection, the Court is not required to give any explanation for adopting the recommendation.  *See Camby v. Davis*, 718 F.2d 198, 200 (4th Cir. 1983).

### B.     Summary Judgment

Summary judgment is appropriate when the materials in the record show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.

The party seeking summary judgment bears the initial burden of demonstrating to the Court that there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this threshold showing, in order to survive summary judgment, the nonmoving party must demonstrate that specific, material facts exist that give rise to a genuine

issue. *See id.* at 324.

## C.      Habeas Corpus Review

### 1.      *Deference to state courts*

Any claim in a § 2254 petition that was adjudicated on the merits in a state court proceeding may not be granted unless the state court's adjudication of the claim

(1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

To meet this standard, the state court must have "arrive[d] at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or . . . decide[d] a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). This is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citations omitted). "If this standard is difficult to meet, that it because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

### 2.      *Ineffective assistance of counsel*

Criminal defendants have a constitutional right to the assistance of counsel. U.S. Const. amend. VI. "[T]he right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (citation omitted).

To prevail on an ineffective assistance claim, a petitioner must show that (1) counsel's acts or omissions fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See id.* at 687–88, 694. Failure of proof on either prong ends the matter. *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004). There is "a strong presumption that counsel's conduct falls within the wide range of professional assistance," and a petitioner has the burden of overcoming this presumption. *Strickland*, 466 U.S. at 689. "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence." *Harrington*, 562 U.S. at 105 (citing *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (citing *Strickland*, 466 U.S. at 690). An ineffective assistance of counsel allegation requires the submission of specific facts in support of the claim. *See United States v. Witherspoon*, 231 F.3d 923, 926 (4th Cir. 2000).

When *Strickland* is applied in the federal habeas context, it is an even taller hurdle to overcome. "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* However, if the petitioner demonstrates that there is no reasonable argument that counsel satisfied *Strickland*, then relief would be appropriate.

### **3.** *Exhaustion and procedural default*

A habeas petitioner may not obtain relief in federal court unless he has exhausted his state court remedies. 28 U.S.C. § 2254(b)(1)(A). "To satisfy the exhaustion requirement, a habeas petitioner must fairly present his claim to the state's highest court." *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997), *abrogated on other grounds by Miller-El v. Dretke*, 545 U.S. 231 (2005). "To exhaust a claim, the petitioner must present the state court with 'both the operative facts and the controlling legal principles.'" *Gray v. Zook*, 806 F.3d 783, 798 (4th Cir. 2015) (quoting *Winston v. Kelly*, 592 F.3d 535, 549 (4th Cir. 2010)).

A petitioner's failure to raise in state court a claim asserted in a § 2254 petition "implicates the requirements in habeas of exhaustion and procedural default." *Gray v. Netherland*, 518 U.S. 152, 161 (1996). "[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance," and has therefore procedurally defaulted those claims. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Gray*, 518 U.S. at 162.

In general, a federal court will not entertain a procedurally defaulted claim as long as the state's procedural requirement barring the court's review is adequate to support the judgment and independence of federal law. *See Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012). However, "[t]he doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Id.* at 10.

A federal habeas petitioner cannot claim ineffective assistance of counsel in state post-conviction proceedings to establish cause for default because there is no constitutional right to counsel in state post-conviction proceedings. *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991). However, *Martinez* recognized a "narrow exception" to *Coleman*, specifically that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9. The Fourth Circuit has summarized the exception recognized in *Martinez* as follows:

> [A] federal habeas petitioner who seeks to raise an otherwise procedurally defaulted claim of ineffective-assistance-of-trial-counsel before the federal court may do so only if: (1) the ineffective-assistance-of-trial-counsel claim is a substantial one; (2) the "cause" for default "consists of there being no counsel or only ineffective counsel during the state collateral review proceeding"; (3) "the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim"; and (4) state law "requires that an ineffective-assistance-of-trial-counsel claim be raised in an initial-review collateral proceeding."

*Fowler v. Joyner*, 753 F.3d 446, 461 (4th Cir. 2014) (internal brackets omitted) (quoting *Trevino v. Thaler*, 569 U.S. 413, 423 (2013)). Essentially, if initial-review collateral counsel was constitutionally ineffective in failing to raise the constitutional ineffectiveness of trial counsel, that ineffectiveness by collateral counsel may excuse the petitioner's procedural default of a substantial claim of trial counsel's ineffectiveness.

## III.   Discussion

Owens raised twelve grounds for relief in his habeas petition. The Court will address each one.

### A.   Ground 1 – Failure to investigate and present mitigating evidence

Ground 1 of the amended petition is as follows:

> Trial counsel was ineffective at Petitioner's 2006 sentencing proceeding for failing to investigate and present available and compelling mitigating evidence.

ECF No. 117 at 6. Evaluating this claim requires consideration of the evidence sentencing counsel did present and what Owens says they should have presented.

### 1. *Overview of mitigation case*

Owens' mitigation case consisted of testimony from five individuals: (1) Marjorie Hammock, a social historian; (2) Fain Maag, Owens' third-grade teacher; (3) Dr. Tora Brawley, a neuropsychologist; (4) Dr. Thomas Cobb, a forensic psychiatrist; and (5) Dr. Donna Schwartz-Watts, a forensic psychiatrist.

### a. *Marjorie Hammock*

Hammock testified about Owens' troubled upbringing, including that he was born to an 18-year-old woman who was unable to properly care for Owens and his four siblings, that he witnessed and personally experienced significant violence at the hands of his biological father and then his step-father, that a number of his family members (both male and female) were very violent and served time for violent offenses, that he was removed from his house at a young age and placed in the foster system for a period of time because of abuse and neglect, that he was taught to be violent in order to survive, that he had learning disabilities that resulted in significant school difficulties, that his family lived a marginal existence in terms of economics and education, and that there is a correlation between this type of upbringing and a person who was raised in that environment turning to violence. She also explained Owens' family tree in some detail, pointing out that a significant number of his family members had been incarcerated, that there was alcohol and drug abuse throughout the family, and that the family members had very low levels of

education.  *See* ECF No. 16-3 at 466–84.

b.    *Fain Maag*

Maag testified about her experiences with Owens as his third-grade teacher.  She told a story about how, on his first day of school, he threw a desk across the room and asked her what she was going to do about it.  She also described how he had a very difficult time on the playground—his peers, recognizing that he was smaller than they were, would chase him around and he would run to her for help.  She also testified about him frequently being chased home from school and that his step-father would lock him out of the house, telling him that he had to fight the other boys so he would grow up to be a man.  His problems at home were well-known to her, as she described never having a parent-teacher conference, bringing him a turkey on Thanksgiving, and giving him Christmas gifts.  She further testified about his learning deficiencies, particularly his difficulty reading and poor social skills.  However, she did note that he was "one heck of a runner," that he was an artist, and that he used words quite well, even though he did not necessarily spell them correctly.  *See* ECF No. 16-3 at 485–89; ECF No. 16-4 at 4–5.

c.    *Dr. Tora Brawley*

Dr. Brawley testified about her evaluation of Owens' mental abilities.  She testified that his verbal memory and verbal learning were below what she would expect, and that he had a documented learning disability, problems with impulsivity, and poor attention.  However, she noted that he had improved his IQ score by a significant margin through his own efforts.  She testified that many of his problems were documented as early as elementary school and that there were indications that he had lifelong problems with depression.  She explained that childhood depression can manifest itself as aggression, irritability, impulsivity, and resistance.  She also

20

referred to a head injury he suffered as a child, though she could not specifically point to any brain malfunction as a result of that injury. *See* ECF No. 16-4 at 6–18.

d. *Dr. Thomas Cobb*

Dr. Cobb testified about his impressions of Owens after treating him over the course of about one year while he was at Lieber Correctional Institution within the South Carolina Department of Corrections (SCDC) system. Dr. Cobb testified that his first interaction with Owens was when he reached out to Dr. Cobb for help because Owens had been getting in a lot of trouble in prison and wanted help staying out of trouble. Dr. Cobb said that Owens was a likeable person, was very intellectual and philosophical, and was someone Dr. Cobb enjoyed talking to. He discussed some of the troubling aspects of Owens' childhood, including that he had a rough childhood and that most or all of his family members were incarcerated.

Dr. Cobb diagnosed Owens with Impulse Control Disorder (Not Otherwise Specified) and Anxiety Disorder (Not Otherwise Specified), and Dr. Cobb explained to the jury what those diagnoses meant. He also explained the medications that he prescribed for Owens for the purpose of allowing his mind to stay calm and give him time to think before reacting. Dr. Cobb felt that this treatment was helpful and that Owens' prognosis would continue to improve if he stayed on the medication. However, Dr. Cobb acknowledged on cross-examination that, after the medication regime started and after he had been treating Owens for about six months, he possessed in his cell a 12-inch shank and then, six weeks later, an 8½-inch shank. *See* ECF No. 16-4 at 18–38.

e. *Dr. Donna Schwartz-Watts*

Finally, Dr. Schwartz-Watts testified about her evaluation of Owens. She spent about ten hours with him over the course of three visits. She also reviewed a great number of his records,

including the following: Department of Juvenile Justice (DJJ) treatment records, disciplinary reports, and write-ups; SCDC disciplinary reports; and medical records (both while in custody and out of custody). She also spoke with a number of people in his life, including his mother, Maag, Dr. Brawley, Dr. Cobb, the forensic psychiatrists at DJJ, and some of his past doctors.

Dr. Schwartz-Watts discussed some of Owens' traumatic childhood experiences, including that he suffered physical abuse, that he witnessed his grandmother shoot a family member, that he frequently did not go to school because he wanted to stay home to check on his mother (who was physically abused by his father and step-father), and that he witnessed his step-father chase his mother through the house with a machete.

Regarding Owens' time at DJJ, Dr. Schwartz-Watts noted that, even though he had significant disciplinary problems, he did well with the ROTC program and was promoted to the highest rank available at his campus.

Dr. Schwartz-Watts diagnosed Owens with Attention Deficit Disorder (ADD), Dysthymic Disorder (chronic depression), and Antisocial Personality Disorder. Regarding the ADD diagnosis, she testified that he began the testing process for ADD while a child, but he never completed the full assessment and was never given any medication for it. She concluded that the ADD symptoms were in partial remission, noting that he could now pay attention and had taught himself Arabic, Swahili, and sign language, and was studying French. She also said that he was reading scholarly works and was teaching other inmates how to read. Regarding the depression diagnosis, she said that he had experienced symptoms of depression beginning at least in 1995 when he was at DJJ and that he began receiving treatment for major depression in 1997. But when he transferred to SCDC upon turning 18 years old, he was not continued on his medications even though he had significantly improved on them and wanted to continue taking them. He also asked

SCDC for psychiatric help at that time, but did not receive it. However, he had improved since he began receiving treatment from Dr. Cobb. She said that Owens was still impulsive, but not as much as he had been in the past. Finally, she testified that he would be able to receive appropriate treatment while in SCDC custody. *See* ECF No. 16-4 at 38–79.

### 2.    *Owens' claims*

Owens asserts that there were two primary areas of mitigation that sentencing counsel should have presented: (1) a more extensive presentation by Hammock, the social historian; and (2) evidence regarding his experiences while in DJJ.

The gist of Owens' complaint regarding sentencing counsel's mitigation presentation is that it was too short and left out many important details. He notes in particular that Hammock's testimony was significantly shorter than it had been in the two prior sentencing proceedings. In support of his argument, he relies in large part on the PCR testimony of Dr. James Garbarino, who was admitted as an expert on the psychological effects of trauma and violence on youths. He based his testimony and opinions on various reports and other paperwork, as well as a four-hour conversation with Owens. Dr. Garbarino testified on multiple topics, including the general effects of chronic trauma on children and risk factors that increase a person's propensity to engage in violence. As to Owens in particular, Dr. Garbarino testified that Owens' risk factors included parental abandonment and neglect, living in a violent neighborhood, an extensive family history of violence, school difficulties and learning disabilities, exposure to drug and alcohol abuse, and experiencing and witnessing sexual abuse. Dr. Garbarino testified in significant detail about Owens' childhood and young adult life, which included a number of incidences of physical and sexual abuse that Owens allegedly suffered as a child and while incarcerated in local jails, DJJ, and SCDC. However, Dr. Garbarino acknowledged on cross-examination that there was no

corroborating evidence to support the sexual abuse allegations. In particular, there was no indication in any of his custodial records that Owens reported these alleged assaults to anyone. *See* ECF No. 16-6 at 181–286.

### 3. *PCR order*

In the PCR order, the judge concluded that Owens could not establish ineffective assistance of counsel because sentencing counsel "properly conducted a thorough investigation into potential mitigating evidence and chose to present evidence that it thought would favor Owens at trial." ECF No. 16-14 at 161. The PCR court found legitimate reasons that Hammock's testimony was shorter than in the prior sentencing hearings, including that part of her prior testimony was no longer relevant. *Id.* at 162. The PCR court further found that Owens was not prejudiced by any omissions from her testimony, as the other witnesses addressed those topics that she did not.

As to the evidence regarding Owens' experiences at DJJ, the PCR court noted that "[a]lthough Owens met with six defense attorneys, two mitigation investigators, one private investigator, and a number of mental health experts before meeting with Garbarino in 2009, he failed to inform any of these individuals of this alleged abuse." ECF No. 16-14 at 164. The PCR court further noted that there were no records to support the allegations of abuse. *Id.* The PCR court also credited sentencing counsel's testimony about why they did not want to present mitigation evidence regarding Owens' time at DJJ, specifically finding that doing so "would have come at the great cost of opening the door for the State to introduce evidence that would characterize Owens as a consistently violent criminal who would be a future danger to society and who would not adapt well to prison." *Id.* at 166.

### 4.    *R&R*

In the R&R, the magistrate judge concluded that the PCR court's analysis regarding Hammock's testimony did not involve an unreasonable application of federal law on either *Strickland* factor. In particular, the magistrate judge noted that sentencing counsel's PCR testimony "reveal[ed] careful planning, which incorporated Hammock's own analysis of how effective her past testimony had been." ECF No. 193 at 22. The magistrate judge further concluded that "it was not unreasonable for the PCR court to conclude that 'Owens' trial counsel made the strategic decision not to elicit testimony from Hammock that was no longer relevant.'" *Id.* at 23 (quoting ECF No. 16-14 at 162). The magistrate judge also found that "there is support in the record for the PCR court's finding that sentencing counsel presented a cogent mitigation case through their five witnesses." *Id.* at 28. Finally, the magistrate judge found that "[t]he PCR court did not unreasonably misapply federal law in finding [Owens] was not prejudiced by any alleged failure on sentencing counsel's part." *Id.* at 29.

Regarding the DJJ evidence, the magistrate judge again concluded that the PCR court's analysis did not involve an unreasonable application of federal law regarding either *Strickland* factor. The magistrate judge recognized that sentencing counsel were aware, at least to some extent, of Owens' experiences while in DJJ, noting sentencing counsel's testimony at the PCR hearing that "[w]e were clearly looking at that. Dr. Schwartz-Watts had his DJJ records. [Owens] was at DJJ at a time when DJJ in Columbia was a mess." *Id.* at 31 (quoting ECF No. 16-6 at 105). The magistrate judge also noted sentencing counsel's testimony that he reviewed Owens' DJJ records, but that he viewed them as a "two-edge sword" because he "wasn't particularly happy with the reason why he was in DJJ." *Id.* (citing ECF No. 16-6 at 106–07).

The magistrate judge also recognized some apparent confusion in the PCR order regarding

its discussion of Dr. Garbarino's testimony,[3] but determined that the PCR order's conclusion was not based solely on that finding and that the overall conclusion was amply supported by the record. *Id.* at 32–34. Thus, the magistrate judge concluded that "the PCR court's ultimate conclusion that sentencing counsel were not deficient was not 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id.* at 34 (quoting 28 U.S.C. § 2254(d)(2)).

### 5. *Objections*

In Owens' objections, he argues that the R&R erroneously concluded that sentencing counsel were not ineffective. He asserts that there was "reasonably available and readily accessible" evidence that should have been presented at sentencing that "was lurid, compelling and humanizing." ECF No 199 at 4. Specifically, he argues that sentencing counsel should have presented evidence regarding his homosexual prostitution and sexual abuse, as well as physical abuse he suffered *in utero* and as a child.

Owens relies in large part on Dr. Garbarino's PCR testimony. But, as noted above, Dr. Garbarino only became involved in the case after sentencing, so his testimony would not have been available to sentencing counsel. Thus, it appears that Owens' argument is that the facts underlying Dr. Garbarino's testimony, not his testimony itself, should have been offered in mitigation.

Owens also references an incident in September 1997 (shortly after his release from SCDC custody, but before the Graves murder) where Reverend Thomas Davenport "was cruising the

---

[3] The PCR order repeatedly refers to allegations of ineffective assistance based on a decision not to present Dr. Garbarino's testimony at sentencing, but he was not involved in the case at the time of sentencing; he only became involved at the PCR stage.

street looking for sex with a male," and was shot twice in the head from inside his vehicle, implicitly by Owens. Reverend Davenport survived the shooting. Owens says that an arrest warrant that was issued for him for that incident was closed after his arrest for the Graves murder. He says that sentencing counsel should have investigated this incident further for presentation at sentencing. *Id.* at 9.

He summarizes his objection by asserting that he was prejudiced by sentencing counsel's failure to introduce a more vivid picture of his life history because doing so would have created a reasonable probability that at least one juror would have voted for a life sentence.

### 6. *Analysis*

At the outset, the Court notes the deferential standard of review in this matter as set forth in the caselaw. The question before the Court is not whether sentencing counsel could have or should have presented a more detailed mitigation presentation. The question the caselaw raises is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard" by presenting the mitigation case that they did. *Harrington*, 562 U.S. at 105. The Court answers that question in the affirmative.

As the magistrate judge recognized, sentencing counsel's investigation "reveal[ed] careful planning, which incorporated Hammock's own analysis of how effective her past testimony had been." ECF No. 193 at 22. While Hammock's testimony was not as detailed as it had been in the prior two sentencings, she and other witnesses covered the same ground that she had covered in her prior testimony.[4] The jury heard about many different aspects of Owens' life, including the

---

[4] The longer, more detailed presentations at the two prior sentencing proceedings also resulted in death sentences.

violence he personally suffered and witnessed, the lengthy and violent criminal records of his family members, being taught at a young age to handle his problems through violence, his learning disabilities and school difficulties, his mental health issues, and the correlation between these types of issues and a person resorting to violence in adulthood. The fact that sentencing counsel could have introduced some additional details that would have painted an even more vivid picture of his life does not mean that their decision not to introduce those additional details "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686; *see also Moody v. Polk*, 408 F.3d 141, 154 (4th Cir. 2005) ("[P]rejudice does not exist simply because more corroborating evidence could have been presented. . . . Given that the prosecutor did not present any evidence to contradict the evidence of abuse, there is simply no reasonable probability that the jurors doubted the existence of abuse and would have come to a different verdict had they been presented further evidence that abuse in fact occurred.").

Owens focuses a significant portion of his briefings on the argument that counsel should have presented evidence regarding the sexual abuse he allegedly suffered in his early adolescence and while in DJJ. However, he does not dispute that there was no record of these assaults in any of his records and that he denied being a sexual assault victim when asked. As the magistrate judge recognized, "[i]t is difficult to fathom how counsel could have been deficient for failing to search for or present evidence about incidents that Owens never shared with them or his mitigation team and that they had no reason to know of otherwise even after an extensive and thorough investigation." ECF No. 193 at 34.

Owens asserts that the R&R would "demand proof in the form of an institutional incident report from DJJ or the statement of an eyewitness of this sexual assault before considering that it

unreasonably determined this matter factually," and that it "would mandate that [he] hector and cajole his capital counsel and explain to them what they could find and where to find it in presenting his mitigational case."  ECF No. 199 at 6–7.  He also asserts that "the PCR Court unreasonably applied relevant law by requiring [him] to provide written documentation of his own sexual abuse at DJJ."  *Id.* at 6.  These statements are not supported by the analysis in the R&R and PCR order.

The R&R appropriately recognized that sentencing counsel cannot be faulted for failing to undercover evidence that they had no reason to believe existed—there was no evidence of sexual abuse in his records and Owens denied experiencing it when questioned by the mitigation team. Far from requiring the submission of written documentation or requiring him to "hector and cajole" sentencing counsel, *id.* at 7, the R&R and PCR court properly refused to blame sentencing counsel for failing to uncover something that he denied occurred and for which there was no evidence in his records, aside from sentencing counsel's general knowledge that all was not well at DJJ during that time period.  *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  . . .  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.").

The fact that Owens told Dr. Garbarino about these experiences at a much later time is not relevant to the analysis.  The Court acknowledges Owens' argument that there may well be factors that would make it difficult for a person in his position to admit having been sexually assaulted, but that cannot form the basis of a finding of ineffective assistance of counsel.  A habeas petitioner cannot withhold relevant information from his counsel and mitigation team, and then spring it

upon the court in a habeas petition in an attempt to overturn his sentence. *See DeCastro v. Branker*, 642 F.3d 442, 456 (4th Cir. 2011) ("[T]he state court did not act unreasonably in refusing Petitioner's attempt to upend his conviction and sentence based on the information that he failed to timely provide to counsel.").

Owens also discusses the shooting of Reverend Davenport, asserting that this information should have been presented to the jury. As mentioned above, this shooting resulted in an arrest warrant being issued for Owens, but ultimately no charge or conviction, as the case was apparently dropped after he was arrested for the Graves murder. It is not clear why he believes that he would have been less likely to receive a death sentence if he had admitted to the attempted murder of a clergyman during the short period between his release from prison and the Graves murder.[5] There is certainly a "reasonable argument that counsel satisfied *Strickland*'s deferential standard" in not putting this matter in front of the jury. *Harrington*, 562 U.S. at 105.

For these reasons, Owens has failed to establish that the PCR court's denial of his claims in Ground 1 was contrary to or involved an unreasonable application of clearly established federal law, or was the result of unreasonable factual findings. *See* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 101. Accordingly, the Court concludes that he has not met his burden and is therefore not entitled to relief on Ground 1.

**B.      Ground 2 – Failure to object to admission of prison disciplinary infractions**

Ground 2 of the amended petition is as follows:

Trial counsel was ineffective at Petitioner's 2006 sentencing proceeding for failing to object to the list of prison disciplinary infractions on Confrontation Clause and

---

[5] Owens refers to the shooting as an "amazing bit of insight into [his] alter life." ECF No. 199 at 9.

Due Process, Eighth Amendment and Proportionality Grounds.

ECF No. 117 at 6.

### 1. *Owens' claims*

At sentencing, the State attempted to introduce, through an SCDC records custodian, a list of Owens' prison disciplinary infractions. Sentencing counsel objected based on the trustworthiness of the records, but did not raise a Confrontation Clause objection. The trial court excluded a number of the infractions and some specific details of others, but ultimately allowed the State to introduce a list of twenty-eight infractions that included such incidents as "throws hot water on an inmate"; "stabs correctional officer Smith in the face with a shank"; "stabs Undra Golden in the shower"; possessing a shank on seven other occasions; and multiple other assaults on officers, staff, and inmates. ECF No. 16-3 at 458–60. Owens asserts that sentencing counsel were ineffective in failing to object based on Confrontation Clause grounds, and that if sentencing counsel had objected, this evidence would have been excluded, which would have resulted in a different outcome at sentencing.

### 2. *PCR order*

In the PCR order, the judge concluded that Owens could not establish either deficient performance or prejudice. ECF No. 16-14 at 157–160. As to deficient performance, the court concluded that the records were admissible under the business records exception to the hearsay rule and that non-testimonial business records do not implicate the Confrontation Clause. *Id.* at 157–58. The court concluded that these records "were not prepared in anticipation of producing testimony at trial, but rather in accordance with South Carolina statutory law for the administration of prison affairs." ECF No. 16-14 at 158–59. The PCR court also cited *Crawford v. Washington*,

541 U.S. 36 (2004) for the proposition that business records are non-testimonial and therefore not subject to confrontation. *Id.* at 158 (citing *Crawford*, 541 U.S. at 56). As to prejudice, the court concluded that a Confrontation Clause objection would have been overruled and that it was harmless error in any event because "the State introduced overwhelming evidence of Owens' future dangerousness, bad character, and inability to adapt to prison life." *Id.* at 160.

### 3.    *R&R*

In the R&R, the magistrate judge concluded that Owens failed to show that the PCR court unreasonably applied federal law in finding the disciplinary records to be non-testimonial in nature and therefore exempt from Confrontation Clause scrutiny. ECF No. 193 at 38–39. The magistrate judge noted that the PCR court cited South Carolina statutory and case law requiring SCDC to maintain inmate records to support the argument that the primary purpose of the records was not to "creat[e] an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011). The magistrate judge further noted that Owens did not point to any Supreme Court case to the contrary. Thus, the magistrate judge concluded that the PCR court did not unreasonably apply federal law in determining that the prison disciplinary records were non-testimonial in nature. ECF No. 193 at 40.

As to the PCR court's alternative finding that the disciplinary records were cumulative to other evidence already admitted, the magistrate judge found that there was support in the record for that conclusion. In particular, Major Thierry Nettles at Lieber Correctional Institution testified that Owens was "assaultive, destructive, and damaging . . . bar none, my most problematic inmate," and Dr. Schwartz-Watts testified regarding his extensive history of prison disciplinary infractions and she was questioned about the details of some of them. *Id.* at 40–41.

Finally, the magistrate judge concluded that, even if *de novo* review applied, Owens still

would not be entitled to relief because the Confrontation Clause does not apply at sentencing, including capital sentencing. *Id.* at 41 (citing *United States v. Umaña*, 750 F.3d 320, 346 (4th Cir. 2014)).

### 4.    *Objections*

In Owens' objections, he relies in large part on the Supreme Court's decision in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) for the proposition that the prison disciplinary records were testimonial in nature and, thus, even if they qualified as business records for hearsay purposes, they were still inadmissible under *Crawford*. He also quotes at length the opinion dissenting from the denial of rehearing en banc in *Umaña*. Owens asserts that he was prejudiced by the admission of these records because "the jury was allowed to consider highly prejudicial evidence that he had no opportunity to subject to adversarial testing." ECF No. 199 at 19. He does not address the R&R's conclusion that there is support in the record for the PCR court's alternative finding that the disciplinary records were "cumulative proof of aggravating factors." ECF No. 16-14 at 160.

### 5.    *Analysis*

In arguing that his prison disciplinary records were testimonial in nature, Owens relies in large part on *Melendez-Diaz*, but that case is distinguishable. *Melendez-Diaz* involved a question of whether, in a drug case, state prosecutors could prove that the substance at issue was cocaine by relying on affidavits from forensic analysts, or whether the analysts were subject to confrontation. 557 U.S. at 307. The Supreme Court concluded that the affidavits were testimonial, and the preparers therefore subject to confrontation, because they were "'made under circumstances which would lead an objective witness reasonably to believe that the statement

would be available for use at a later trial,'" and the sole purpose of the affidavits was to provide evidence of the composition, quality, and weight of the substance. *Id.* at 311 (quoting *Crawford*, 541 U.S. at 52).

By contrast, the prison records in this case were not prepared for the purpose of establishing Owens' guilt for the offenses for which he was charged. As the PCR court concluded, these records were prepared "in accordance with South Carolina statutory law for the administration of prison affairs." ECF No. 16-14 at 158–59. Furthermore, the R&R correctly notes that both the Supreme Court and Fourth Circuit have held that there is no confrontation right at sentencing, even in capital cases.[6] *See Williams v. New York*, 337 U.S. 241, 246–48 (1949); *Umaña*, 750 F.3d at 346. Thus, this Court concludes that there is a "reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

In addition, Owens failed to object to the magistrate judge's conclusion that the PCR court did not make an unreasonable factual determination in concluding that the list of prison disciplinary infractions was cumulative. Because of the lack of objection, the Court is not required to give an explanation for adopting the recommendation, *see Camby*, 718 F.2d at 200, but the Court notes that there is support in the record for the PCR court's and the magistrate judge's conclusions.

For these reasons, Owens has failed to establish that the PCR court's denial of his claims in Ground 2 was contrary to or involved an unreasonable application of clearly established federal law, or was the result of unreasonable factual findings. *See* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 101. Accordingly, the Court concludes that he has not met his burden and is therefore not

_____

[6] Owens relies on the opinion dissenting from denial of rehearing en banc in *Umaña*, but that position has not prevailed on a majority of the Fourth Circuit or the Supreme Court, which denied certiorari in *Umaña*. 135 S. Ct. 2856 (2015).

entitled to relief on Ground 2.

**C.      Ground 3 – Failure to object or request proper instructions regarding the crime scene video**

Ground 3 of the amended petition is as follows:

Trial counsel was ineffective at Petitioner's 2006 sentencing proceeding for failing to object or request proper instructions from the court regarding the crime scene video.

ECF No. 117 at 6.

**1.      *Owens' claims***

At Owens' sentencing, the State introduced, through the testimony of a responding officer, a convenience store video, which showed two armed, masked individuals entering the convenience store and Graves being shot.  Owens summarizes the video as follows:

The video does indeed show two masked men dressed in dark clothing entering the Speedway store, but it is impossible to determine their identities.  After the two men enter, the video focuses primarily on a single man standing in front of the counter, directly opposite Ms. Graves and pointing a gun at her head.  The second man is not visible for most of the remainder of the video.  The man opposite the counter continues pointing his gun at Ms. Graves and then she falls backwards to the floor before the two men run away out of the store.

ECF No. 117 at 73 (citation omitted).  At Owens' first two sentencing proceedings, his co-defendant testified that he, not Owens, was the person primarily visible in the video, and the State introduced evidence showing that the fatal shot came from the person standing off-camera.  The co-defendant did not testify at the third sentencing proceeding.

In his PCR application, Owens raised this issue by arguing that sentencing counsel were ineffective in "fail[ing] to object and/or request proper instructions from the court when the State played a crime scene video without further explanation or analysis."  ECF No. 16-5 at 2.  In his habeas petition, he argues that sentencing counsel were ineffective in "fail[ing] to object to [the

responding officer's] testimony, seek an explanatory instruction or otherwise convey to the jury that no jury or judge had ever found that [Owens] was the triggerman." ECF No. 117 at 74. He asserts that, because the jurors had been told that he had been convicted of murder and that they would be seeing video evidence, they assumed that he was the person primarily visible in the video. *Id.* at 73. He also notes that the jurors in the third resentencing were not told that the jury from the guilt phase could have found him guilty without first determining that he was the triggerman. *Id.* He asserts that "[t]he video's admission, under these particular circumstances and without further instruction, was misleading and prejudicial, and it undermined the jurors' ability to meaningfully consider that [he] may not have been the shooter." *Id.* at 75. He claims that there was no forensic evidence establishing that he fired the fatal shot and that the only other evidence that he was the triggerman was the "prior self-interested testimony" of his co-defendant and his "jilted ex-girlfriend." *Id.* at 79.

Additionally, in his petition, Owens argues that sentencing counsel had an obligation to affirmatively respond to the State's implication that he was the triggerman. *See id.* at 80 ("The state's presentation of aggravating testimony—even of such little evidentiary value, as described here—triggers counsel's obligation to rebut if there is a means by which to do so.").

###    2.    *PCR order*

In the PCR order, the judge concluded that sentencing counsel were not ineffective in failing to object to the State playing the video because "there was nothing improper about the State's publication of the crime scene video to the jury." ECF No. 16-14 at 150. The court noted that "[t]he video was relevant to the aggravating factors alleged by the State, the circumstances of the crime, and the character of the defendant, all of which are proper factors for a sentencing jury in a capital trial to consider." *Id.* at 150–51. Thus, the court concluded that sentencing counsel

were not ineffective in failing to object to the video because there was no reasonable basis for an objection. *Id.* at 151.

As to any possible instruction from the judge regarding the video, the PCR court concluded that "any jury instruction that the court could have given regarding the contents of the video would have required the court to comment upon the facts of the case, which would have been improper." *Id.* The court also noted that sentencing counsel testified at the PCR hearing "that they knew that an instruction clarifying the content of the crime scene video would have violated South Carolina law and that a request for any such instruction would be denied." *Id.*

The PCR court also concluded that Owens was unable to show that he was prejudiced by sentencing counsel's failure to object or request an instruction. *Id.* The court noted that the jury "heard testimony that Owens was the triggerman, that he shot Graves while standing behind the counter and near the safe, and that he shot Graves because she would not open the safe." *Id.* The court concluded that in light of all the evidence presented, he could not prove that there was a reasonable probability that he would have received a life sentence had sentencing counsel objected or had the sentencing judge instructed the jury as to its contents. *Id.* at 152.

### 3. *R&R*

In the R&R, the magistrate judge found that the PCR court did not make unreasonable factual findings or unreasonably apply federal law when it denied Owens' claims on this ground. ECF No. 193 at 46–47. In responding to his argument that the PCR court unreasonably found that sentencing counsel testified that they "knew" that a request for a clarifying instruction about the video would have been denied, the magistrate judge determined that "the PCR court reasonably concluded that sentencing counsel were not deficient for failing to object because there was no proper objection to be made . . . ." *Id.* at 44. The magistrate judge also determined that the record

supported the PCR court's conclusion that Owens had not demonstrated that there was a reasonable probability that he would have received a life sentence had the State not played the video or had the judge instructed the jury as to its contents. *See id.* at 45–46.

Additionally, the magistrate judge concluded that, to the extent Owens' argument exceeded the claim that had been raised to and ruled on by the PCR court, the argument was procedurally barred. *Id.* at 46. Thus, the magistrate judge determined that his argument that sentencing counsel had an obligation to rebut the State's evidence that he was the triggerman was procedurally barred and that he had neither alleged nor demonstrated cause and prejudice to excuse the procedural bar. *Id.*

### 4. *Objections*

Owens' objections are consistent with the arguments he raised in his petition. *See* ECF No. 199 at 23–27. He did not specifically address the magistrate judge's conclusion that any argument that sentencing counsel had an obligation to rebut the State's evidence that he was the triggerman was procedurally barred.

### 5. *Analysis*

Regarding the video being shown to the jury, Owens must show that the PCR court made unreasonable factual findings or unreasonably applied federal law in concluding that sentencing counsel were not ineffective in failing to object to the video being shown. He has not met that burden, as the PCR court correctly concluded that there was nothing improper about the video because it was relevant to the issues before the jury and there was no other reasonable basis for an objection. *See* ECF No. 16-14 at 150–51. Accordingly, there is at least a "reasonable argument that counsel satisfied *Strickland*'s deferential standard" in not making such an objection.

*Harrington*, 562 U.S. at 105.

Similarly, regarding any instruction from the judge about the video, Owens cannot show that sentencing counsel were ineffective in failing to request some sort of clarifying instruction. The PCR court correctly noted any such instruction would have been improper. ECF No. 16-14 at 151 (citing S.C. Const. art. V, § 21).

Owens makes much of the fact that the PCR court states that sentencing counsel testified at the PCR hearing that they "knew" that a request for such an instruction would have been denied, even though they actually testified that they had not considered making such a request at the sentencing hearing. *See* ECF No. 16-6 at 28–29, 81. However, they did testify at the PCR hearing that they were aware that it would have been improper for the judge to have commented on the video. *See id.* at 61, 128. Contrary to Owens' argument, it is irrelevant that the PCR order was somewhat imprecise in implying that they had made a strategic decision to not object because they knew at the time that it would have been denied. The bottom line is that a request for the judge to comment on what the video showed would have been denied based on South Carolina law, and it is not ineffective assistance to fail to recognize an opportunity to make a request that would be denied.

Owens also failed to demonstrate that the PCR court made unreasonable factual findings or unreasonably applied federal law in concluding that he could not prove that he was prejudiced by the failure to object to the introduction of the video or the failure to request a clarifying instruction about the video. The PCR court noted that the jury "heard testimony that Owens was the triggerman, that he shot Graves while standing behind the counter and near the safe, and that he shot Graves because she would not open the safe." ECF No. 16-14 at 151. He questions the reliability of the testimony implicating him as the triggerman by his "self-interested" co-defendant

and his "jilted ex-girlfriend," but his own evaluation of their reliability does not make the PCR court's findings unreasonable. The Court cannot conclude that the PCR court made unreasonable factual findings or unreasonably applied federal law in reaching the conclusion that he failed to demonstrate prejudice. *See Cullen*, 563 U.S. at 181 (noting the "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt").

Finally, to the extent that Owens is arguing that sentencing counsel had an affirmative obligation to rebut the State's implication that he was the triggerman, the magistrate judge correctly determined that such an argument is procedurally barred because it was not raised to the PCR court and Owens has failed to demonstrate cause and prejudice to excuse the default. *See Gray*, 518 U.S. at 162. Furthermore, as the magistrate judge noted, it is not clear from Owens' petition what evidence he believes sentencing counsel should have presented to rebut the State's argument that he was the triggerman. *See* ECF No. 193 at 46 n.14.

For these reasons, Owens has failed to establish that the PCR court's denial of his claims in Ground 3 was contrary to or involved an unreasonable application of clearly established federal law, or was the result of unreasonable factual findings. *See* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 101. Accordingly, the Court concludes that he has not met his burden and is therefore not entitled to relief on Ground 3.

### D. Ground 4 – Failure to object to testimony from Officer Wood and Juliana Christy

Ground 4 of the amended petition is as follows:

Trial counsel was ineffective at Petitioner's 2006 sentencing proceeding for failing to object to irrelevant, inflammatory, and prejudicial testimony from both Officer Joe Wood, who testified Petitioner gave him "cold chills," and Juliana Christy, a victims' advocate who testified this case was "the hardest case she ever had to work

on" in fifteen years at the Greenville County Sheriff's Department.

ECF No. 117 at 6.

### 1. Owens' claims

Owens argues that sentencing counsel were ineffective in failing to object to certain testimony from Officer Joe Wood, who was one of the investigators on the Graves murder, and Juliana Christy, a victims' advocate with the Greenville County Sheriff's Department.

#### a. Officer Wood

Wood testified about his interview with Owens after he was arrested for the Graves murder. Wood testified, in relevant part, as follows:

> Q:     We were at the point where you told Mr. Owens that what he was telling you was not adding up, or something to that effect?
>
> A:     That's correct.
>
> Q:     And did he say anything to you in response to that?
>
> A:     He did.
>
> Q:     What did he say?
>
> A:     He said "the only thing I'm here for is to eat, sleep, shit and piss.  I don't give a shit.  I was born to be in jail."
>
> Q:     After he made that comment, did you make any other comment to him?
>
> A:     Yes, ma'am.
>
> Q:     What was that?
>
> A:     I asked him at that point if he was aware that his mother was—had indicated that she was going to turn him in.
>
> Q:     Did he respond to that?
>
> A:     He did.

Q:     What did he say?

A:     He said "if my mom says anything, tell her I said adios, to kiss her ass too. She can kiss my ass too. Tell Ian and the rest of them assholes to fuck themselves. If I go to jail, I go to jail. I don't give a shit."

Q:     After he made that comment, did you say anything to him or did he make any further comments to you about himself?

A:     He was pretty much just talking and I was writing as fast as I could, because I wanted to make sure that I got everything written down. He pretty much just continued on from that point and he said "people tend to think I have a sick and evil mind, but I have a very educated mind. I would like to take the blame for all of this, but I'm not going to take it all myself. I made my mark on Hall Street after I got out of jail selling lots of drugs. I made lots of money. Yeah, I want to be remembered as the one who killed the most people in Greenville. I'm a real menace."

Q:     Mr. Wood, what was Freddie Owens demeanor during this conversation that you had with him?

A:     He was cocky. He had a don't-care attitude. He smiled a lot when he was saying this.

Q:     How did he make you feel?

A:     He's one of two people out of probably 25 years in homicide that I have interviewed that actually gave me cold chills.

ECF No. 16-3 at 164–65.

Owens argues that sentencing counsel were ineffective in failing to object to the "how did he make you feel?" question and the "cold chills" answer, as he asserts that this allowed "an arbitrary, speculative, inflammatory and irrelevant consideration into the jury's sentencing decision." ECF No. 117 at 84. He also asserts that sentencing counsel were ineffective in failing to object to the prosecutor's reference to the "cold chills" testimony in his closing argument. *Id.* at 85.

          b.     *Juliana Christy*

Christy testified about the morning she told Graves' two young children that their mother

had been killed. She explained how she went to their house to notify the children, how the children reacted upon hearing about their mother's death, and how they had to go off with their grandmother, whom they barely knew. ECF No. 16-3 at 340–46. At the conclusion of Christy's testimony, she testified, in relevant part, as follows:

> Q:     Now, Ms. Christy, how long have you been a victim advocate?
>
> A:     15 and a half years.
>
> Q:     And in that 15 years, how many cases have you been involved in in which you assisted victims or their families on crimes?
>
> A:     Thousands.
>
> Q:     And how would you describe this event in your career?
>
> A:     This was the hardest, hardest case I have ever had to work on. I have never had to do death notification before, or since, and this is definitely the hardest case I have. It affected me the most deeply, and still does.

ECF No. 16-3 at 347.

Owens argues that sentencing counsel were ineffective in failing to object to Christy's testimony describing the event in the context of her career, as he asserts that "[her] testimony relayed the impact that Ms. Graves' death had on her own life and career," which is not permissible victim impact evidence pursuant to *Payne v. Tennessee*, 501 U.S. 808 (1991). ECF No. 117 at 88. He also asserts that she improperly provided opinion testimony by saying that this case was worse than any other she had handled. *Id.* at 89. Finally, he asserts that this testimony was more prejudicial than probative. *Id.*

### 2.     *PCR order*

In the PCR order, the judge concluded that Owens could not establish either deficient performance or prejudice as to the testimony from Wood or Christy.

As to Wood, the PCR court concluded that his entire testimony was admissible because it

was introduced as evidence of Owens' character and future dangerousness. ECF No. 16-14 at 153. And because it was admissible, it was properly relied on by the State in closing. *Id.* Thus, the PCR court concluded that sentencing counsel were not deficient in failing to object to its admission. *Id.* Additionally, the PCR court concluded that, based on the entirety of the State's evidence, he could not prove that there was a reasonable probability that he would have received a life sentence had sentencing counsel objected. *Id.* at 153–54.

As to Christy, the PCR court concluded that her entire testimony was also admissible because it was offered to show the harm that Owens caused by murdering Graves and it was relevant to a determination of his moral culpability. *Id.* at 154–55. As to the Rule 403 argument, the PCR court concluded that her testimony was properly admitted for the purposes permitted by *Payne*. *See id.* at 156. Finally, the PCR court concluded that he could not show prejudice because even if she had not testified, the State would have presented other evidence of the effect of Graves' murder on her children, and Christy's testimony was cumulative of other testimony in evidence. *See id.* at 156–57.

### 3.    *R&R*

In the R&R, the magistrate judge concluded that Wood's testimony about Owens giving Wood "cold chills" can reasonably be interpreted as a description of a physical sensation that Owens' statements prompted in Wood, rather than an opinion. ECF No. 193 at 48. The magistrate judge further determined that "[i]t was not unreasonable for the PCR court to find that Wood's testimony concerning Owens's statements and demeanor constituted character evidence, and the 'cold chills' statement was part of that character evidence." *Id.*

As to Christy's testimony, the magistrate judge found that "a reasonable interpretation" of it was that "it served as further evidence of how deeply Graves's death impacted her children." *Id.*

at 50. The magistrate judge concluded that the PCR court did not make unreasonable factual findings or unreasonably apply federal law in making that finding. *Id.*

The magistrate judge also found that, even if sentencing counsel could have been successful in objecting to Wood's or Christy's testimony, Owens had to demonstrate to the PCR court that sentencing counsel's failure to object rendered their representation constitutionally insufficient, and that he failed to meet that burden. *Id.* at 51.

Finally, the magistrate judge concluded that the PCR court did not make unreasonable factual findings or unreasonably apply federal law in concluding that Owens could not show that he was prejudiced by these asserted errors. *See id.* at 52–53.

### 4.    *Objections*

In his objections, Owens argues that Wood's "cold chills" testimony was "irrelevant, inflammatory, and prejudicial." ECF No. 199 at 28. Owens asserts that sentencing counsel should have known that this testimony was coming and objected to it because Wood made the same comment at the first two sentencings. *Id.* at 28–29. Owens argues that the PCR court did not explain how this testimony constituted non-opinion evidence or reflected his character, and that "the R&R confabulates a physical sensation with the ability to use that same sensation as a pathway to character evidence." *Id.* at 29–30.

In his objections regarding Christy's testimony, Owens asserts that *Payne* does not allow the testimony that she gave, and that she should not have been permitted to testify about the impact the death notification had on her own life and how it compared to other cases she has handled.

### 5.    *Analysis*

Regarding Wood's testimony, Owens must show that the PCR court made unreasonable

factual findings or unreasonably applied federal law in concluding that counsel were not ineffective in failing to object to Wood's "cold chills" testimony. Owens has not met that burden, as it was not unreasonable for the PCR court to conclude that the questioned portion of Wood's testimony constituted character evidence. As the State argued, Wood hearing Owens describe himself as "a real menace" and that he wanted "to be remembered as the one who killed the most people in Greenville," and then saying that these statements gave Wood, a veteran homicide detective, cold chills conveyed to the jury that he treated Owens' words as serious statements, not bravado. It is reasonable to conclude that Wood likely would not have felt that way if he thought Owens was embellishing his criminal exploits. Thus, the PCR court correctly concluded that there was nothing improper about Wood's testimony, and there is at least a "reasonable argument that counsel satisfied *Strickland*'s deferential standard" in not objecting to it. *Harrington*, 562 U.S. at 105.

Regarding Christy's testimony, the Court agrees with the magistrate judge that the PCR court did not make unreasonable factual findings or unreasonably apply federal law in finding it admissible. While the particular question at issue asked about the impact of "this event" on her career, ECF No. 16-3 at 347, it was clear from the context of the question that "this event" referred to the death notification, not the murder itself. She was not testifying about the impact the murder had on her; she was testifying about the terrible impact the murder had on Graves' young children, who did not testify at the sentencing. The context of her testimony made it clear that when Christy said this case was harder for her than any other case she had handled, she felt that way because of the profound impact that the notification had on the children.

The fact that Christy's testimony was a step removed from the direct testimony of a family member that the Supreme Court permitted in *Payne* does not change the analysis. In his objections,

Owens says that Christy, because she was not a member of Graves' family, "was therefore not within the narrow class of witnesses *Payne* permits to provide a quick glimpse of the victim's life." ECF No. 199 at 32 (italics added). *Payne*, however, contains no such limitation. Though the victim impact testimony in that case happened to come from the victim's mother, *Payne*, 501 U.S. at 814–15, the Supreme Court's decision did not hinge on that fact. The Court merely held that the Eighth Amendment "erects no *per se* bar" on a state "permit[ting] the admission of victim impact evidence and prosecutorial argument on that subject." *Id.* at 827. Owens does not cite any case law for the proposition that the testimony has to come directly from the affected family member.

Furthermore, to the extent Owens argues that Christy's testimony was inadmissible because she mentioned the impact it had on her, that argument is untenable. Even if her testimony should not have ventured into the impact the death notification had on her, he cannot show any prejudice from its admission. It is not reasonable to conclude that the jury, having just heard the heart-wrenching story about how Graves' young children reacted to the news of her death, would have been influenced in any meaningful way by a sheriff's office employee also being upset about it.

For these reasons, Owens has failed to establish that the PCR court's denial of his claims in Ground 4 was contrary to or involved an unreasonable application of clearly established federal law, or was the result of unreasonable factual findings. *See* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 101. Accordingly, the Court concludes that he has not met his burden and is therefore not entitled to relief on Ground 4.

**E.**     **Ground 5 – Failure to object to improper closing argument and statements during jury selection**

Ground 5 of the amended petition is as follows:

Petitioner's rights under the Eighth and Fourteenth Amendments were violated as a result of the prosecution's improper closing argument and improper statements during jury selection, and trial counsel was ineffective for failing to object to the same.

ECF No. 117 at 6.

### 1.     *Owens' claims*

Owens alleges that the solicitor made a series of statements in his closing argument that violated federal and state law.  In his second amended PCR application, Owens challenged the following statements:

(1)     "Only limited circumstances are allowed for us to seek the death penalty, and rarely do we seek the death penalty in all those cases that are eligible.  In only certain cases do we choose to seek the death penalty."  ECF No. 16-4 at 137.

(2)     "There are mean and evil people in this world who do not deserve to continue to live with the rest of us, regardless of how confined they may be.  The law limits the right to seek the death penalty to a very select number of cases, very few, and we seek the death penalty in only a few, but the circumstances where we seek it is available for mean and evil people who commit atrocious acts of murder; the worst of the worst.  That is what the death penalty is reserved for.  Those whose behavior sets them apart even from the criminal world, and that is Freddie Owens, and this murder and his behavior are one of those cases."  *Id.* at 140–41.

(3)     "Big prison is like a little city.  In prison he will have all the necessities of life.  Sure, he will be in solitary, but he will still have food to eat.  They will provide him clothes.  He will have books to read.  He will be able to recreate and exercise.  He will have doctors to take care of him.  He will have the clothing that they provide, and he will have contact with his family and loved ones, and TV at times, and he will have family business.  Not much more than a change of address for Freddie Owens.  So don't think putting Freddie Owens in prison for the rest of his life is going to be a significant punishment for him.  *Id.* at 146.

(4)     "They have said earlier that the solicitor is not satisfied with a life sentence, and I am not, and that's why we have asked for the death penalty. They told you that I was going to want the death penalty, and I do."  *Id.* at 140.

*See* ECF No. 16-5 at 4.[7]

Owens argues that sentencing counsel were ineffective in failing to object to these statements. He asserts that evidence regarding general prison conditions is not relevant and that it was improper for the solicitor to inject his personal opinion into the jury's decision. ECF No. 117 at 98. He also asserts that the solicitor's arguments "undermined the concept of discretion afforded to a jury as required by the Eighth Amendment," and that "[t]hey are inconsistent with the Court's mandate in *Caldwell* [*v. Mississippi*, 472 U.S. 320 (1985)] that the jury cannot be '. . . led to believe that the responsibility for determining the appropriateness of the defendant's death sentence rests elsewhere.'" *Id.* at 99. Finally, he asserts that "the PCR court refused to consider the cumulative impact of constitutional error and instead erroneously addressed each of the Solicitor's comments in turn." *Id.* at 104.

### 2.    *PCR order*

In the PCR order, the judge concluded that the solicitor's first and second statements quoted above, to the effect that the State pursues a death sentence only rarely, were not improper, as the solicitor was merely explaining that the State does not pursue the death penalty in every death-eligible case. ECF No. 16-14 at 167.

The judge concluded that the third statement quoted above, to the effect that the death penalty was appropriate because a life in prison would have been too easy on Owens, was also not improper, as "[t]hese arguments were tailored to the specific crimes that Owens committed and to

---

[7] To the extent Owens now seeks to challenge any other statements made in closing, such a challenge is procedurally defaulted because no other statements were raised in the PCR application, and he has not set forth cause and prejudice to excuse the default. *See Gray*, 518 U.S. at 162. Accordingly, the above statements are the only ones the Court will address.

Owens himself." *Id.* The judge determined that, given some of Owens' statements to investigators after the Graves murder—that he "was born to be in jail" and "If I go to jail, I go to jail, I don't give a shit"—it was appropriate to argue that life in prison would not be a significant punishment for him. *Id.* at 168.

The judge also concluded that the fourth statement quoted above, to the effect that the solicitor himself wanted the death penalty, was not improper given the context in which it was made. *Id.* The judge determined that this was simply a statement that he was seeking the death penalty because it was appropriate under the facts of the case and that these comments merely explained the State's position. *Id.*

Additionally, the judge found that, even if Owens could establish deficiency, he could not prove prejudice, as the challenged comments were only a small portion of a lengthy closing argument and the trial court told the jury that they were not required to return a death sentence. *Id.* The judge concluded that "[g]iven the admitted evidence of guilt, the circumstances of the crime, the curative jury instruction, and the great amount of evidence in aggravation, Owens is unable to prove that there is a reasonable probability that the jury would have returned a life verdict had the solicitor not made these comments." *Id.* at 169.

### 3.    *R&R*

In the R&R, the magistrate judge concluded that "Owens has failed to show that the PCR court's conclusions rest on unreasonable factual findings or an unreasonable application of federal law." ECF No. 193 at 54. The magistrate judge found that the PCR court's reasoning was consistent with federal law and that Owens failed to demonstrate how the PCR court's conclusions were contrary to or an unreasonable application of federal law. *Id.* As to Owens' assertion that the PCR court did not consider the cumulative impact of constitutional error, the magistrate judge

determined that "[w]hile the PCR court considered the propriety of each comment separately, it considered the comments together when determining whether [Owens] was prejudiced by sentencing counsel's failure to object." *Id.* at 55.

### 4.     *Objections*

Owens argues that the solicitor's arguments "suggested that the jurors should defer to his expertise in evaluating the gravity of [Owens'] crime relative to other murders," and that the arguments "misle[d] the jury into believing that a lifetime in prison would amount to a comfortable, easy life" for Owens.  ECF No. 199 at 37.  He argues that sentencing counsel were deficient in failing to object to these statements "both as they were individually stated during the course of the trial and in view of the cumulative impact it had." *Id.* at 38.  He asserts that the PCR court did not address the cumulative impact of the asserted errors and that the R&R erroneously "continue[d] this piecemeal analysis rather than evaluate the cumulative effect the misstatements had on the jury's view of its role and responsibility." *Id.* at 39.[8]

### 5.     *Analysis*

As to the solicitor's statements that the State only rarely pursues the death penalty, the PCR court did not unreasonably apply federal law in concluding that these statements were not improper.  Owens does not cite any cases holding that it is improper for a prosecutor to explain

---

[8] Owens also argues that the solicitor misstated the law by arguing that it was Owens' burden to prove that he deserved a life sentence rather than the death penalty and that he improperly urged the jury to impose a death sentence for the greater good of the community.  ECF No. 199 at 38. However, as noted above, these arguments were not raised to or ruled on by the PCR court and are therefore procedurally barred.  *See Gray*, 518 U.S. at 162.  Furthermore, in considering the argument in full and the judge's charge on the law, no relief is warranted.

that while most cases do not warrant pursuit of the death penalty, the particular case in question does warrant it.

Regarding the solicitor's statements about the relative ease of life in prison for Owens, the PCR court did not unreasonably apply federal law in concluding that these statements were not improper. The PCR court properly recognized that, given Owens' statements to the effect that he was not concerned about being incarcerated, there was nothing wrong with the solicitor arguing that prison would not be an adequate punishment for him.

As to the solicitor's statements that he wanted the death penalty, the PCR court did not unreasonably apply federal law in concluding that these statements were not improper. As the PCR court recognized, these statements were merely the solicitor explaining the State's position that the death penalty was appropriate, and Owens has not cited any cases to the effect that such a statement is improper.

Finally, the PCR court did not unreasonably apply federal law when it concluded that, even if Owens could show deficiency, he could not show prejudice. He repeatedly asserts that both the PCR court and the R&R erred in not considering the cumulative impact of the statements, ECF No. 199 at 39, but that assertion is not accurate. As the magistrate judge noted, the PCR court evaluated each comment separately for deficiency purposes, but properly considered them together when evaluating prejudice. ECF No. 193 at 55 (citing ECF No. 16-14 at 167–69).

For these reasons, Owens has failed to establish that the PCR court's denial of his claims in Ground 5 was contrary to or involved an unreasonable application of clearly established federal law, or was the result of unreasonable factual findings. *See* 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 101. Accordingly, the Court concludes that he has not met his burden and is therefore not entitled to relief on Ground 5.

**F.     Ground 6 – Failure to present evidence of institutional negligence**

Ground 6 of the amended petition is as follows:

> Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to investigate, develop and present evidence of institutional negligence which would have mitigated the State's theory that the in-custody death of Mr. Lee conclusively established future dangerousness and the only sentencing option for the petitioner was death. Evidence from expert witnesses available at the time of the petitioner's sentencing trial demonstrated that institutional negligence in failing to classify, and detain the petitioner in accordance with that classification, was the proximate cause of the death of Mr. Lee. 5th, 6th, 8th and 14th Amendments to the Constitution of the United States of America; *Skipper v South Carolina*, 476 US 1 (1986).

ECF No. 117 at 6–7.[9]

### 1.     *Owens' claims*

In Ground 6, Owens alleges that sentencing counsel were ineffective in failing to present evidence of Greenville County Detention Center's institutional negligence regarding the murder of Christopher Lee that Owens committed in the early morning hours of February 16, 1999, which was immediately after his conviction but before his first sentencing.[10]  He acknowledges that this

---

[9] Owens acknowledges that this ground has not been exhausted and is being advanced pursuant to *Martinez*.  ECF No. 117 at 112.

[10] Owens gave the following written confession later that morning:

> At eleven p.m., on 2-15-99, myself and the other inmates in my cell block watched the news and saw that I was found guilty.  I then worked out and took a shower.  I went to bed and woke up whenever they came to get one of the other inmates to take him to Perry.  This was around three a.m.  While they were getting the guy ready to go to Perry, Christopher Lee said you won't be the only one because Freddie is coming down there with you.  I told him to shut the fuck up.  He told me his cousin was on the jury.  I asked him if he knew that they convicted me.  He said fuck you, I know because my cousin was on the jury.  End quote.  I then walked into his cell and hit him in the eye.  He fell down on his back.  I got on top and started hitting him mostly in the face and throat.  I took a pen from his right hand and my right hand and stabbed him in his right eye.  I then tried to stab him in his chest but the pen would not go in.  I then stabbed him in his throat.  I don't know if

claim is procedurally defaulted, but attempts to overcome that bar by asserting that his PCR counsel was ineffective in failing to raise this issue. He also ties this claim in with Ground 7 by alleging that counsel should have "weav[ed] together" evidence of institutional negligence with evidence of brain damage. *Id.* at 109.

Regarding the murder, Owens alleges, upon information and belief, that there was no correctional officer assigned to the cell block where Owens and Lee were housed, and that the visual security system was not in operation at that time. *Id.* at 104–05. Two years after the murder,

---

the pen went into his throat or not. He started bleeding out of his mouth. There was a sheet tied into a snare laying on his bed. I reached and got it and put it over his head onto his neck. I wrapped it around my left hand and pulled it tight. I started hitting him in the face with my right hand. Then I started choking him with my right hand and pounding his head against the floor. He never fought back after the first punch he was out of it. He was still breathing and the stuff coming out of his mouth stunk, so I stood up and stomped his head and body with my feet. I saw a black and blue lighter under the bunk. I grabbed it and burned him around the eye and on the left side of his head. I rammed his head into the wall. He was still moaning and breathing. I walked out of the cell to leave him alone. I heard the crazy moaning again, so I grabbed the pen off the floor where I had thrown it and went back into his cell. I got back over him and rammed the pen up his right nostril. I closed his left nostril with my left hand and started choking him with my right hand. The sheet was still around his neck. I was choking him above the sheet. Throughout all of the above he was moaning and breathing. I kept checking him to see if he was dead. I would check his pulse on his wrist, and I put my ear beside his neck and chest to hear if he was breathing. I wanted him to be dead at that time. I finally thought he was dead, so I threw him on his bunk and covered him up. The first time I put him on the bunk he fell off. I then packed my stuff and put my mattress on the table and went to- sleep. While I packed my stuff, the black guy that had been on the top bunk of Christopher's cell the whole time this went on got down and put his mattress on the other table and sit down. Everyone in the cell block was awake when I left Christopher. I woke up when Hefner opened the door to bring in breakfast. When I got in the line I was third in line and Sergeant McNeill walked by and I told him to cuff me. He said he would not, and I told him he would if he with [sic] go into Christopher's cell. He looked into the cell and Hefner went into the cell. Sergeant McNeill told Hefner to cuff me, which he did. Sergeant McNeill then called someone on the radio. I really did it because I was wrongfully convicted of murder.

ECF No. 16-3 at 405–08.

Lee's personal representative brought a civil action against several defendants, including Greenville County and the Greenville County Detention Center. *Lee v. Greenville County, et al.*, No. 6:01-cv-00427-TLW (D.S.C.).[11] Owens was not a party to the case. Prior to jury selection, the case settled for $600,000.

### 2.      *R&R*

In the R&R, the magistrate judge began by recounting the facts of Lee's murder, including Owens' written confession explaining in graphic detail how he carried out the murder. ECF No. 193 at 62–63. She then distinguished the facts in *Rompilla v. Beard*, 545 U.S. 374 (2005), cited by Owens, from the facts of this case. *Id.* at 65–66. She noted that, in contrast with *Rompilla*, sentencing counsel in this case were well-aware of the Lee murder and attempted to mitigate it by showing a change in Owens from the Lee murder in 1999 to the third sentencing in 2006. *Id.* at 66. Thus, she concluded that, although sentencing counsel were not aware of the civil suit, they "were not willfully ignorant of the facts of his aggravating crime," and were therefore not deficient. *Id.* at 66–67.

Regarding PCR counsel's performance, the magistrate judge concluded that PCR counsel made reasonable efforts to investigate the issue, though her efforts to obtain Lee's family's litigation file were ultimately unsuccessful. *Id.* at 67.

The magistrate judge also concluded that sentencing counsel were not deficient in "failing to pursue a trial strategy that is borderline frivolous and potentially inflammatory." *Id.* She found

---

[11] Owens asserts that he was unable to obtain a copy of the complaint in that case because the Court denied him permission to conduct discovery regarding that file. ECF No. 117 at 106. No order from this Court or the magistrate judge prevented him from obtaining the public filings in that case. Even if filed documents in older cases are not available on PACER, they are still readily available, as explained on the Court's website: https://www.scd.uscourts.gov/Records/record.asp.

that even if the detention center was negligent, that "does not diminish Owens's own criminal culpability in beating, burning, stomping, and choking Lee until he was sure that Lee was dead." *Id.* at 68.

Finally, the magistrate judge determined that even if sentencing counsel were deficient, Owens could not show that he was prejudiced because he had not shown that evidence of institutional negligence, whether or not in combination with evidence of a brain abnormality, would have rendered the Lee murder less aggravating. *Id.* at 69. She noted that attempting to shift blame for the murder to the detention center could have invited the idea that if he were sentenced to prison and he was not properly confined at all times, the result could be fatal. *Id.*

For these reasons, the magistrate judge concluded that Owens failed to present a substantial *Strickland* claim and that the procedural default therefore could not be excused pursuant to *Martinez. Id.*

### 3. *Objections*

In his objections to the R&R, Owens argues that mitigating the Lee murder was essential to obtain a life sentence and that his petition (with the attached affidavits) made a threshold showing that the claim had some merit. ECF No. 199 at 47. He also argues that the magistrate judge misapprehended "both the issue and the evidence" regarding institutional negligence. *Id.* He claims that "[t]he R&R in essence finds that future dangerousness in this case is irrebuttable and conclusive as a matter of law because of the brutality of the crime." *Id.* at 47–48. He argues that his evidence establishes that but for the institutional negligence by the detention center, Lee's death would not have occurred. *Id.* at 48.

4.      *Analysis*

The Court agrees that attempting to mitigate the Lee murder was important to Owens' attempt to avoid the death penalty. But where his argument fails is that, unlike in *Rompilla*, his sentencing counsel were well-aware of the issue. Recognizing that they could not keep it from the jury, they attempted to mitigate it by arguing that he had changed in the time between the Lee murder in 1999 and the third sentencing proceeding in 2006. *See* ECF No. 16-6 at 130–32. While sentencing counsel did not know about the civil suit by Lee's family, they knew that the jail's security decisions that night were less than stellar. *See id.* at 133 ("For the jail to put him back in a pod with general population after being found guilty of murder under these circumstances was incredibly stupid."). Thus, as the magistrate judge concluded, they were not willfully ignorant of the facts of his aggravating crime, and were therefore not analogous to counsel in *Rompilla*. ECF No. 193 at 66–67.

The magistrate judge also properly recognized that sentencing counsel were not deficient because trying to mitigate the Lee murder by blaming it on the jail would have been "borderline frivolous and potentially inflammatory." *Id.* at 67. Owens' prison expert's report on the incident concluded that "[i]f only basic necessary measures were taken regarding the above listed system issues leading up to the critical event, it is reasonable to conclude that the critical event involving the death of Mr. Lee would have been prevented." ECF No. 117-7 at 11. Taking this conclusion as correct—that Lee's murder would not have occurred if the jail had taken "basic necessary measures"—does not absolve Owens or mitigate his actions. While the jail's failure to keep Owens away from other inmates after his conviction may have contributed to Lee's death, it should go without saying that Lee would not have met his untimely death had Owens not murdered him. As the magistrate judge aptly recognized,

> The possibility that the detention center was negligent under a civil tort standard in failing to prevent Owens from having the opportunity to murder Lee does not diminish Owens's own criminal culpability in beating, burning, stomping, and choking Lee until he was sure that Lee was dead. And it would have been easy for a jury to see through such an attempt to shift blame.

ECF No. 193 at 68.

Furthermore, making such an argument to the jury may well have had an unintended result because, as the magistrate judge noted, it would have invited the idea that if he were sentenced to life and any mistakes were made by the prison system, the result could be fatal. *See Moody*, 408 F.3d at 151–52, 154 (finding no prejudice where the proposed evidence was as likely to harm the petitioner as to help him). This is particularly so when combined with the violence depicted in his prison disciplinary records, which included multiple assaults and stabbings, and multiple weapons possessions. This is also so regardless of whether evidence of the jail's negligence had been offered in combination with evidence of a brain abnormality.

For these reasons, the underlying ineffective assistance claim for this ground fails on the merits and Owens therefore cannot rely on *Martinez* to overcome the procedural default. Accordingly, he is not entitled to relief on Ground 6.

### G. Ground 7 – Failure to present evidence of brain damage

Ground 7 of the amended petition is as follows:

> Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to investigate, develop and present objective and scientific evidence of structural and functional brain damage resulting from early childhood trauma and materially limiting the applicant's ability to make informed decisions, learn from past behavior, and control impulses resulting from recurrence of situation prompts in daily living which were the same or similar to those of his early childhood. 5th, 6th, 8th, and 14th Amendments to the Constitution of the United States of America; Wiggins v Smith, 539 US 510 (2003).

ECF No. 117 at 7.[12]

### 1. *Owens' claims*

In this claim, Owens alleges that sentencing counsel were ineffective in "failing to investigate, develop[,] and present objective and scientific evidence of structural and functional brain damage resulting from early childhood trauma[,] which materially limits [his] ability to make informed decisions, learn from past behavior, and control impulses . . . ." ECF No. 117 at 113. He bases his argument on two reports.

The first report, by Dr. Ruben C. Gur, is a volumetric analysis of an MRI scan and a quantitative analysis of a PET scan performed by Dr. Gur and his colleagues at the University of Pennsylvania.[13] ECF No. 117-17. This report concluded that Owens has brain abnormalities that "indicate diminished executive functions such as abstraction and mental flexibility, planning, moral judgment, and emotion regulation, moderating limbic arousal, and especially impulse control." *Id.* at 4.

The second report, by Dr. Stacey Wood, is a neuropsychological review and evaluation of Owens. ECF No. 117-18. Based on her review of various materials and evaluation of him, she concluded that he has "significant brain impairment." *Id.* at 17. She also stated that "[e]arly indicators of brain injury were present during the developmental period and warranted further investigation. As such, the possibility of an organic cause for some of Mr. Owen's [sic] profile should have at least been considered and explored during previous phases of this matter." *Id.* at

---

[12] Owens acknowledges that this ground has not been exhausted and is being advanced pursuant to *Martinez*. ECF No. 117 at 125.

[13] The MRI and PET scans were performed at the Medical University of South Carolina, but the analyses were performed at the University of Pennsylvania.

21.

Owens argues that sentencing counsel were ineffective in failing to further investigate whether he had brain deficiencies.  He claims that sentencing counsel should have been alerted to investigate further because of two medical factors—the diagnosis of a seizure disorder and the thirteen-point difference between his verbal and performance IQ.  ECF No. 174 at 126.  He also claims that the sentencing testimony of Drs. Brawley and Schwartz-Watts undermines the claim that sentencing counsel's investigation was sufficient.  *Id.*

### 2.    *R&R*

In the R&R, the magistrate judge concluded that sentencing counsel were not deficient for failing to further investigate and present evidence regarding Owens' mental health and brain function.  ECF No. 193 at 72.  The magistrate judge determined that sentencing counsel, after an investigation by three mental health experts into Owens' mental health, were not presented with a reason to perform further investigation.  *See id.* at 75–76.  She noted that there were "no indications that any of those experts advised sentencing counsel to obtain neuroimaging, and the conclusion of sentencing counsel's retained neuropsychologist was that Owens did not have any significant brain dysfunction."  *Id.* at 75.

For these reasons, the magistrate judge concluded that Owens failed to present a substantial *Strickland* claim and that the procedural default therefore could not be excused pursuant to *Martinez.  Id.* at 79.

### 3.    *Objections*

In his objections to the R&R, Owens asserts that evidence was available to sentencing counsel that establishes that he "suffers with organic brain damage that material [sic] impacts his

cognitive functioning including his ability to reason." ECF No. 199 at 49. He further asserts that sentencing counsel "did not consider investigating, developing and presenting such evidence." *Id.* He argues that the R&R excused these failures by pointing to what sentencing counsel did do rather than considering what they did not do. *Id.* He also asserts that the Court denied him the opportunity to present this evidence at an evidentiary hearing, which prevented him from presenting this evidence as it relates to moral culpability. *See id.* at 50.

### 4.    *Analysis*

As the magistrate judge recognized, sentencing counsel developed a mitigation strategy that focused on how Owens' difficult childhood led him to the point where he committed the Graves murder, but argued that he had since reached out for help and was trying to better himself. ECF No. 193 at 73 (citing ECF No. 16-6 at 89–91). As part of that strategy, sentencing counsel presented the testimony of three mental health experts—Drs. Cobb, Brawley, and Schwartz-Watts—who evaluated him and could testify regarding his past, present, and future. Nothing in the record indicates that any of these experts advised counsel to obtain neuroimaging, and Dr. Brawley's evaluation resulted in her concluding that Owens did not have any significant brain dysfunction. *See* ECF No. 16-4 at 18. Sentencing counsel were not ineffective in failing to pursue neuroimaging when none of their experts believed it to be necessary. *See Byram v. Ozmint*, 339 F.3d 203, 210 (4th Cir. 2003) ("[A] failure to 'shop around' for a favorable expert opinion after an evaluation yields little in mitigating evidence does not constitute ineffective assistance."); *Wilson v. Greene*, 155 F.3d 396, 403 (4th Cir. 1998) ("To be reasonably effective, counsel was not required to second-guess the contents of [their expert's] report. . . . [C]ounsel understandably decided not to spend valuable time pursuing what appeared to be an unfruitful line of investigation.") (citation omitted). The Court cannot conclude that counsel's failure to pursue

neuroimaging in light of these facts "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

Additionally, as the magistrate judge noted, sentencing counsel had in their possession evidence very similar to what Owens now says they should have obtained. Specifically, they had the evaluation and prior testimony from Dr. James Evans, who testified at the second sentencing. His evaluation described certain brain abnormalities that "could be relatively severe in terms of temper-impaired attention, behavioral impulsivity." ECF No. 15-7 at 420. However, sentencing counsel declined to use him as a witness for two primary reasons: (1) sentencing counsel wanted a witness whose testimony would "more easily dovetail in with Donna Schwartz-Watts and what Donna Schwartz-Watts had to say"; (2) Dr. Evans had sent his test "out west, like to California," and sentencing counsel were concerned about how that might play in front of a local jury. ECF No. 16-6 at 137–39. Thus, while sentencing counsel had similar evidence to what Owens now seeks, sentencing counsel made a strategic decision to not use that evidence and instead pursue a different mitigation angle, which is a decision that is entitled to great deference. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . .").

For these reasons, the underlying ineffective assistance claim for this ground fails on the merits and Owens therefore cannot rely on *Martinez* to overcome the procedural default. Accordingly, he is not entitled to relief on Ground 7.[14]

---

[14] Owens' concerns about the lack of an evidentiary hearing are discussed later in this order.

### H.    Ground 8 – Failure to object to jury charge

Ground 8 of the amended petition is as follows:

Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to object to the court's recurring jury charge that a finding of life without parole must be unanimous when that charge was not in the sentencing statute, was false, materially misleading, coercive, abusive and irrelevant to the sentencing function. (5th, 6th, 8th and 14th Amendments to the Constitution of the United States of America; (*Winkler v South Carolina* not yet decided)

ECF No. 117 at 7.[15]

#### 1.    *Owens' claims*

In this claim, Owens asserts that sentencing counsel were ineffective in failing to object to five statements the trial court made during the jury instructions to the effect that the jury could recommend a life sentence and that any such recommendation had to be unanimous.  The five statements that he points to are as follows:

"Ladies and gentlemen, any decision that you make with regard to any sentence for this defendant must be unanimous.  All twelve of you who deliberate must agree." Trans. p. 1585 [ECF No. 16-4 at 170].

"However, a decision to impose a life sentence, like a decision to impose one of death, must be unanimous."  Trans. p. 1594 [ECF No. 16-4 at 179].

"Now the next document I believe that you have is the unanimous recommendation of a sentence for life."  Trans. p. 1597 [ECF No. 16-4 at 182].

"Now, ladies and gentlemen, any decision that you make in this case must be unanimous.  All twelve of you have to agree."  Trans. p. 1598 [ECF No. 16-4 at 183].

"You may impose a sentence of life imprisonment only if you unanimously find beyond a reasonable doubt one, or both, of the aggravating circumstances and agree that the sentence should be life imprisonment."  Trans. pp. 1598–99 [ECF No. 16-4

---

[15] Owens acknowledges that this ground has not been exhausted and is being advanced pursuant to *Martinez*.  ECF No. 117 at 133.

at 183–84].

ECF No. 117 at 126. Owens asserts that these instructions were not consistent with S.C. Code Ann. § 16-3-20(C), which provides in relevant part as follows:

> The jury shall not recommend the death penalty if the vote for such penalty is not unanimous as provided. If members of the jury after a reasonable deliberation cannot agree on a recommendation as to whether or not the death sentence should be imposed on a defendant found guilty of murder, the trial judge shall dismiss such jury and shall sentence the defendant to life imprisonment . . . .

Based on Owens' interpretation of this statute, he asserts that the trial court erred in telling the jury that any recommendation of life must be unanimous. ECF No. 117 at 128. He asserts that these instructions violated his rights under the Fifth, Sixth, and Eighth Amendments and that sentencing counsel were ineffective in failing to object to them. *Id.*

### 2. R&R

In the R&R, the magistrate judge concluded that there was no merit to Owens' argument. The magistrate judge noted that the following language in the statute contemplates the possibility of a unanimous recommendation of life: "If members of the jury after a reasonable determination cannot agree on a recommendation as to *whether or not* the death sentence should be imposed . . . ." ECF No. 193 at 80 (quoting S.C. Code Ann. § 16-3-20(C)) (emphasis added). The magistrate judge also points out that the South Carolina Supreme Court has repeatedly concluded that the statute contemplates a unanimous recommendation of life. *Id.* at 81. Accordingly, the magistrate judge concluded that counsel were not ineffective in failing to object to the challenged instructions, as any such objection would have been overruled because the instructions were correct statements of the law. *Id.*

For these reasons, the magistrate judge concluded that Owens failed to present a substantial *Strickland* claim and that the procedural default therefore could not be excused pursuant to

*Martinez. Id.* at 81–82.

### 3. *Objections*

In his objections to the R&R, Owens asserts that the R&R "fail[s] to appreciate the insidious nature of an instruction that divests and coerces a minority juror into abandoning his or her view of the mitigation evidence and their decision to vote for life. The jury charge that a life without parole sentence must be unanimous is extra-judicial, contradicted by the statute and misleading." ECF No. 199 at 52. He asserts that "requiring a recommendation of life be unanimous is inherently ambiguous, inaccurate and coercive and prevents a minority juror from giving full meaning to the mitigation evidence by voting and maintaining a minority position on the sentence." *Id.*

Owens cites *Boyde v. California*, 494 U.S. 370 (1990) for the proposition that "if there is a 'reasonable likelihood' that a minority juror would apply the instruction to mean that he or she would have to persuade the majority to change their opinion before the minority juror could give meaning to his or her own view then the charge violates the Fifth and Eighth, and Fourteenth Amendments." ECF No. 199 at 52–53. Similarly, he asserts that "[a]ny charge that a juror could reasonably interpret as restricting his or her review and use of mitigation evidence violates the Constitution." *Id.* at 53.

### 4. *Analysis*

At the outset, the Court notes that, as Owens acknowledges, the South Carolina Supreme Court has repeatedly rejected his interpretation of S.C. Code Ann. § 16-3-20(C). *See Winkler v. South Carolina*, 795 S.E.2d 686, 694 (S.C. 2016); *State v. Copeland*, 300 S.E.2d 63, 70 (S.C. 1982); *State v. Adams*, 283 S.E.2d 582, 587 (S.C. 1981), *overruled on other grounds by State v.*

*Torrence*, 406 S.E.2d 315 (S.C. 1991).  Thus, had sentencing counsel objected to the challenged instructions, the trial court would have overruled the objection.

Owens argues that the statute, as interpreted by the South Carolina Supreme Court, is unconstitutional, but there is no merit to that objection.  His position that it is unconstitutional for a court to tell a jury that their sentencing decision, whether for death or life, must be unanimous finds no support in case law.  His analysis misapplies the cases he cites in his objections.  For example, as noted above, he cites *Boyde* for the proposition that "if there is a 'reasonable likelihood' that a minority juror would apply the instruction to mean that he or she would have to persuade the majority to change their opinion before the minority juror could give meaning to his or her own view then the charge violates the Fifth and Eighth, and Fourteenth Amendments."  ECF No. 199 at 52–53.  That proposition finds no legal support in *Boyde*.

In *Boyde*, the jury was given a list of ten specific factors and a general catch-all factor to consider in making its decision on whether or not to recommend a death sentence.  *Boyde*, 494 U.S. at 373–74.  The jury was also told that, after considering all applicable aggravating and mitigating circumstances, the jury "shall impose" a death sentence if the aggravating circumstances outweighed the mitigating circumstances or "shall impose" a life sentence if the mitigating circumstances outweighed the aggravating circumstances.  *Id.* at 374.  The defendant argued that none of the listed factors allowed the jury to consider factors such as his background and character, which were the bulk of his mitigation case.  *Id.* at 378.  The Court held that, in a situation where "the instruction is ambiguous and therefore subject to an erroneous interpretation[,] . . . the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Id.* at 380.  Applying this standard, the Court concluded that there was not a

reasonable likelihood that the jury interpreted the instructions to prevent consideration of his mitigating evidence of background and character. *Id.* at 381. That decision has no relevance to the issue Owens raises in this case—whether it is constitutional to inform a jury that its ultimate decision, whether for death or for life, must be unanimous.

The other primary case cited by Owens in his objections—*Mills v. Maryland*, 486 U.S. 367 (1988)—also affords him no relief. There, the United States Supreme Court reviewed a situation where a reasonable jury could have interpreted the jury instructions and verdict form "to require the imposition of the death sentence if the jury unanimously found an aggravating circumstance, but could not agree unanimously as to the existence of any particular mitigating circumstance." *Mills*, 486 U.S. at 371. The Court reversed because reasonable jurors "may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Id.* at 384. Like the holding in *Boyde*, this holding in *Mills* has no relevance to the question in this case, as there is no reasonable argument that the jurors here were prohibited from considering Owens' mitigating evidence.

Furthermore, Owens does not explain how this situation—where a jury must unanimously decide whether to impose a sentence of death or life imprisonment—is different from the guilt phase of the trial where the jury also must unanimously agree whether the defendant is guilty or not guilty. The fact that the South Carolina legislature decided to codify the result of a hung jury in a capital sentencing—namely, that the defendant will be sentenced to life imprisonment—does not mean that the Constitution requires the jury to be informed of that outcome.

For these reasons, the underlying ineffective assistance claim for this ground fails on the merits and Owens therefore cannot rely on *Martinez* to overcome the procedural default. Accordingly, he is not entitled to relief on Ground 8.

## I.    Ground 9 – Failure to present evidence of early childhood trauma and sexual abuse

Ground 9 of the amended petition is as follows:

Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to investigate, develop and present mitigation evidence that the applicant suffered from repeated early childhood trauma and sexual abuse. These abusive experiences resulted in organic brain injury, ambiguous sexual identity, and created within the applicant a sensitivity to common adult situational prompts that, in his case, lead to a recurrence of the earlier trauma and extreme preemptive fear aggression as the only behavioral response known to the applicant.  5th, 6th, 8th, and 14th Amendments to the Constitution of the United States of America; *Rompilla v Beard*, 545 US 374 (2005).

ECF No. 117 at 7.[16]

### 1.    *Owens' claims*

Ground 9 is related to Ground 1.  In this claim, Owens argues that sentencing counsel were ineffective in failing to conduct a full investigation into his background, which he says would have revealed more detailed information about the significant physical abuse suffered by his mother and him at the hands of his father and step-father.  Specifically, he says that a further investigation would have uncovered evidence of beatings that his mother suffered during each of her pregnancies (including when she was pregnant with Owens) and an incident where his father violently shook him when he was about one year old.

In addition, Owens argues that a full investigation would have provided "a window into [his] hidden life that was never found, developed or presented; a life conflicted with shame, guilt, self-doubt and lack of self-esteem . . . ."  ECF No. 117 at 139.  Specifically, he says that evidence

---

[16] Owens acknowledges that this ground has not been exhausted and is being advanced pursuant to *Martinez*.  ECF No. 117 at 142.

regarding the shooting of Reverend Davenport, discussed in Ground 1, should have prompted sentencing counsel to more fully investigate Owens' sexual history, which "would have at last given weight to this significant part of his life." *Id.* at 141.

### 2. *R&R*

In the R&R, the magistrate judge concluded that, as discussed in more detail in Ground 1, "sentencing counsel and their team performed an extensive and thorough investigation." ECF No. 193 at 84. She noted that the investigators hired by sentencing counsel spoke with a number of his family members, including his mother, both sisters, one brother, and stepfather, as well as a number of non-family witnesses. *Id.* She also noted that, while the jury did not hear about the specific violent incidents that Owens now references, the jury did hear general testimony about the violence his mother and he experienced. *Id.*

In addition, the magistrate judge concluded that, even if Owens could show deficient performance, he could not show prejudice, as "there is no reasonable probability that the jury would have returned with a different sentence had they heard the evidence regarding *in utero* and early childhood physical abuse and Owens's full sexual history." *Id.* at 85. She notes that Dr. Schwartz-Watts was concerned about potential brain damage and requested a neuropsychological evaluation, which revealed no major brain malfunction. *Id.*

For these reasons, the magistrate judge concluded that Owens failed to present a substantial *Strickland* claim and that the procedural default therefore could not be excused pursuant to *Martinez. Id.*

### 3. *Objections*

In his objections to the R&R, Owens asserts that the magistrate judge "[did] not have the

evidence to make that determination at this point because the case is at its beginning and not at its end." ECF No. 199 at 54. He further asserts that the magistrate judge "fail[ed] to assume that the substance of the affidavits and their inferences are true and then apply those truths to the issue of whether [he] articulated a claim of some merit." *Id.* at 55.

### 4. *Analysis*

Though Owens asserts that the magistrate judge did not properly consider the affidavits that he submitted, that belief is not supported by the record. The R&R disputes neither the allegations of extreme violence perpetrated against his mother and him by his father and step-father, nor the allegations regarding his sexual history. The magistrate judge simply concluded that "sentencing counsel and their team performed an extensive and thorough investigation," that the investigators had appropriate discussions with his family members and other individuals, and that the witnesses put on by sentencing counsel adequately conveyed to the jury that violence was a significant part of Owens' life. ECF No. 193 at 84. The Court agrees.

As discussed in more detail in Ground 1, the jury heard about many troubling aspects of Owens' life, including the significant violence his family and he suffered at the hands of his father and step-father. Regarding his sexual history, as discussed in Ground 1, there were no records of him suffering any sexual abuse and he denied it when asked. And as previously noted, it is unclear how it would have been helpful to him to confess to the attempted murder of a clergyman during the short time between his release from prison and the Graves murder.

For the reasons discussed above and in Ground 1, the underlying ineffective assistance claim for this ground fails on the merits and Owens therefore cannot rely on *Martinez* to overcome the procedural default. Accordingly, he is not entitled to relief on Ground 9.

### J.    Ground 10 – Failure to object to prison disciplinary infractions

Ground 10 of the amended petition is as follows:

Trial, direct appellate and collateral counsel were ineffective to the prejudice of the applicant by failing to include as reversible error an objection to the trial court's decision to allow testimony of in-custody administrative rules violations as aggravation evidence supporting a sentence of death when those violations were disproportionate to the crime for which the jury was sentencing the petitioner, did not result in injury, were in part administrative violations common to every inmate and were not characterological of the petitioner's propensity for future violence.

ECF No. 117 at 7.[17]

#### 1.    *Owens' claims*

Ground 10 is related to Ground 2.  As noted above, at sentencing, the State attempted to introduce a list of Owens' prison disciplinary infractions.  The trial court excluded a number of the infractions and some specific details of others, but ultimately allowed the State to introduce the following list of twenty-eight infractions:

| | |
|---|---|
| April 13, 2001: | breaks toilet, sink, and sprinkler |
| May 26, 2001: | throws hot water on another inmate |
| May 27, 2001: | had a six-and-a-half-inch shank made from fencing and toothbrush |
| June 14, 2001: | spat on a correctional officer |
| February 8, 2002: | had a fourteen-inch solid brass shank |
| March 29, 2002: | stabs correctional officer Smith in the face with a shank |
| June 12, 2002: | stabs Undra Golden in the shower |
| June 15, 2002: | kicks an inmate who is restrained in a restraint chair |

---

[17] Owens acknowledges that this ground has not been exhausted and is being advanced pursuant to *Martinez*.  ECF No. 117 at 146.

| | |
|---|---|
| August 5, 2002: | slaps a male nurse in the face |
| August 17, 2002: | throws a food tray and hits officer Guess in the head |
| August 23, 2002: | struck officer in the face with his fist |
| October 22, 2002: | hits officer Eaton in the face with the fist |
| October 23, 2002: | sets fire to cell |
| December 22, 2002: | shank made from fencing |
| December 30, 2002: | a ten-inch [shank] made from a push rod of the sink |
| July 17, 2005: | spits in the face of officer Jones |
| August 26, 2005: | slaps officer Henley in the face |
| August 31, 2005: | sets fire to cell |
| September 11, 2005: | threatens officer Jones |
| January 1, 2006: | a twelve-inch homemade knife |
| January 3, 2006: | breaks cell door window with broom stick |
| January 13, 2006: | throws feces on officer Williams, hitting him in the face |
| February 3, 2006: | spits in the face of another inmate |
| February 4, 2006: | orally threatens officer Jones |
| February 28, 2006: | a twelve-inch weapon hidden between the mattresses |
| April 4, 2006: | an eight-and-a-half-inch shank made from flat metal sharpened at the edge and wrapped with Ace bandage |
| May 1, 2006: | sets fire to his mattress |
| May 20, 2006: | throws coffee on officer Smith |

ECF No. 16-3 at 458–60.

Owens asserts that sentencing and PCR counsel were ineffective in failing to object to the admission of these records on relevance grounds, as he asserts that they are "disproportionate to the type [of] violence necessary to sustain the State's stated purpose for their admission, that

Owens is so violent that he cannot be safely managed while in custody." ECF No. 117 at 143. In making his argument, he asserts that these violations are "administrative regulatory in-custody violations common to most every inmate." *Id.* at 145. Thus, he asserts that these violations were irrelevant to the issues before the jury, particularly his future dangerousness. *Id.*

### 2. *R&R*

In the R&R, the magistrate judge concluded that sentencing counsel were not ineffective on this claim because there was no legal basis for the objection that Owens asserts that sentencing counsel should have made. *See* ECF No. 193 at 89. Additionally, the magistrate judge concluded that even if sentencing counsel had been deficient in failing to make the objection, Owens could not show prejudice because the disciplinary violations were considered and testified to by his own mitigation witness, Dr. Schwartz-Watts. *Id.* at 89–90. Finally, the magistrate judge noted that even those infractions that could be characterized as non-violent could go to different sentencing characteristics, such as character, future dangerousness, and prison adaptability. *Id.* at 88.

For these reasons, the magistrate judge concluded that Owens failed to present a substantial *Strickland* claim and that the procedural default therefore could not be excused pursuant to *Martinez. Id.* at 90.

### 3. *Objections*

Owens objects to the R&R "on the grounds that it fails to parse evidence of administrative infractions against the issue to which they apply." ECF No. 199 at 55. He asserts that custodial infractions are relevant in support of a death sentence only if they "establish that the defendant may kill again." *Id.* at 56. He also asserts that the impact of this alleged deficiency and the impact of the testimony regarding the in-custody murder of Lee "renders the sentencing decision

untrustworthy" based on the "cumulative prejudice" of those asserted errors. *Id.*

### 4.    *Analysis*

Owens' petition does not set forth a clear basis for his belief that the prison disciplinary records that were read to the jury were not relevant to their determination of the appropriateness of the death penalty.  The South Carolina Supreme Court has clearly and repeatedly held that information of this type is relevant at capital sentencing. *See State v. Hughes*, 521 S.E.2d 500, 503 (S.C. 1999) ("[I]t is well-settled [that] evidence of the defendant's behavior in prison is admissible in capital sentencing because it bears upon his character."); *State v. Whipple*, 476 S.E.2d 683, 688 (S.C. 1996) ("[T]he disciplinary records were relevant to [the defendant's] future adaptability in prison, a matter which was clearly proper for the sentencing jury.").  Similarly, in the context of considering whether a defendant's prior convictions for rape and escape were properly admitted, the South Carolina Supreme Court noted that, "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine.  The jury's attention must be focused on both the specific circumstances of the crime and the characteristics of the person who committed it." *State v. Tucker*, 478 S.E.2d 260, 270 (S.C. 1996) (citations omitted).  Owens does not cite any authority calling into question the proposition that a capital defendant's prison disciplinary record is relevant at sentencing.

In his objections, Owens argues that evidence regarding custodial misconduct is relevant only if the evidence is offered to establish that "the most probable result" of not imposing the death penalty is that "the defendant may kill again."  ECF No. 199 at 56.  Again, he cites no specific authority for this proposition, nor is the Court aware of any.

Furthermore, despite Owens' characterization of his many violations as "administrative regulatory in-custody violations common to most every inmate," ECF No. 117 at 145, his

74

misconduct was serious, violent, and certainly probative of issues relevant at capital sentencing, including his character, future dangerousness, and adaptability to prison. *See Hughes*, 521 S.E.2d at 503; *Whipple*, 476 S.E.2d at 688. To reiterate, over a span of about five years, he stabbed an officer with a shank, stabbed an inmate with a shank, possessed shanks seven other times, assaulted officers eight times (in addition to the one officer stabbing), assaulted other inmates three times (in addition to the one inmate stabbing), verbally threatened officers twice, assaulted a nurse, and destroyed property in his cell five times (including setting fire to it three times). *See* ECF No. 16-3 at 458–60.

Finally, as the magistrate judge found, even if Owens could show deficient performance in sentencing counsel's failure to object on relevance grounds, he cannot show prejudice because the disciplinary violations were considered and testified to by his own mitigation witness, Dr. Schwartz-Watts. ECF No. 193 at 89–90.

For these reasons, the underlying ineffective assistance claim for this ground fails on the merits and Owens therefore cannot rely on *Martinez* to overcome the procedural default. Accordingly, he is not entitled to relief on Ground 10.

### K.  Ground 11 – Failure to object to *Brady* violation

Ground 11 of the amended petition is as follows:

Trial counsel duly requested that the State disclose all evidence which might be favorable to the defense. Nonetheless, the State failed to disclose evidence that impeaches material witnesses against the applicant in violation of the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America; *Brady v Maryland*, 373 US 83 (1963) and *Wearry v Cain*, 136 S. Ct. 1002 (2016). Collateral counsel were ineffective to the prejudice of the applicant in failing to recognize that the State did not disclose material items that would have substantially improved the mitigation case and changed cross-examination tactics had the materials been timely disclosed.

ECF No. 117 at 7.

In his petition, Owens acknowledged that this claim had not been exhausted and was being advanced pursuant to *Martinez*. ECF No. 117 at 155. However, in response to the State's motion for summary judgment, he conceded that this claim is not cognizable under *Martinez*. ECF No. 174 at 154. Accordingly, the magistrate judge recommended that the State's motion for summary judgment be granted as to this claim, ECF No. 193 at 60–62, and he conceded the point in his objections, ECF No. 199 at 57.

For these reasons, the underlying ineffective assistance claim for this ground has been procedurally defaulted and Owens cannot rely on *Martinez* to overcome the procedural default. Accordingly, he is not entitled to relief on Ground 11.

### L.     Ground 12 – Failure to challenge the State's decision to seek the death penalty

Ground 12 of the amended petition is as follows:

> Trial and collateral counsel were ineffective to the prejudice of the applicant by failing to challenge the State's decision to seek the death penalty as the decision was motivated by arbitrary factors since the crime was disproportionate to the rare and exceptional case as required by the narrowing features of *Furman v Georgia* and *Gregg v Georgia* and the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States of America.

ECF No. 117 at 7.[18]

#### 1.     *Owens' claims*

In Ground 12, Owens argues that sentencing counsel were ineffective in failing to challenge the solicitor's decision to seek the death penalty in this case. ECF No. 117 at 156–57. He asserts that, had sentencing counsel filed such a motion, there is a reasonable probability that

---

[18] Owens acknowledges that this ground has not been exhausted and is being advanced pursuant to *Martinez*. ECF No. 117 at 162.

the trial court would have not allowed the State to pursue the death penalty against him. *Id.* at 157. His basic argument is that the murder of Graves was "the type of crime that commonly populates the criminal trial docket in Greenville County Court of General Sessions." *Id.* at 161. As such, he believes that this was not a case that warranted the death penalty. *See id.*

### 2.   R&R

In the R&R, the magistrate judge concluded that there was no legal or factual basis for sentencing counsel to have raised the objection. ECF No. 193 at 90. She concluded that Owens did not show that using armed robbery and larceny with a deadly weapon as aggravating circumstances to support the death penalty was incompatible with the Supreme Court's requirements for a death penalty case. *Id.* at 90–91. She noted that, while he characterized the event as a murder that occurred during an "unfortunate, but ordinary armed robbery," ECF No. 117 at 159, the State presented evidence that made this case unusual, including a lack of remorse from Owens and statements attributed to him to the effect that he wanted to murder a great number of people, *see* ECF No. 193 at 91. In addition, the magistrate judge noted that he had previously been incarcerated for burglary and assault with intent to kill. *Id.*

For these reasons, the magistrate judge concluded that Owens failed to present a substantial *Strickland* claim and that the procedural default therefore could not be excused pursuant to *Martinez. Id.* at 92.

### 3.   Objections

In his objections, Owens asserts that the magistrate judge failed to recognize his explanation of the legal principles that apply to a proportionality review. *See* ECF No. 199 at 58. He also asserts that S.C. Code Ann. § 16-3-20(C)(a), which is a list of the statutory aggravating

circumstances that could support application of the death penalty, "does not restrict the crimes for which death is a possible sentence but rather is an exhaustive list of virtually every conceivable murder." ECF No. 199 at 59. He characterizes the offense as an "unfortunate, but ordinary armed robbery." *Id.* at 60. Additionally, he notes that proportionality review is mandated by statute in South Carolina. *Id.*

### 4. *Analysis*

Owens appears to be arguing that sentencing counsel were ineffective in failing to argue that the death penalty would be a disproportionate penalty given the facts of the case. This argument is not persuasive, as the South Carolina Supreme Court conducted the proportionality review required by S.C. Code Ann. § 16-3-25(C)(3). The court concluded that "the death penalty was not the result of passion, prejudice, or any other arbitrary factor," and that it "was neither excessive nor disproportionate." *Owens III*, 664 S.E.2d at 82. Though he may disagree with that court's determination, this Court cannot conclude that sentencing counsel were ineffective in allegedly failing to request something that Owens received.

Furthermore, while Owens asserts that he was unable to find any factually similar case that resulted in a death sentence, ECF No. 117 at 157, his query was directly answered by the South Carolina Supreme Court in his own direct appeal. In considering whether the death penalty in his case was disproportionate, the court cited two prior decisions affirming death sentences for individuals who committed murders during the commission of convenience store robberies. *See id.* (citing *State v. Simpson*, 479 S.E.2d 57 (S.C. 1996); *State v. Humphries*, 479 S.E.2d 52 (S.C. 1996)).[19] In addition, *Simpson* and *Humphries* cited three other factually similar cases where the

---

[19] In fact, like the murder Owens committed, both of these murders occurred in the Upstate region of South Carolina— *Simpson* in Spartanburg County and *Humphries* in Greenville County. *See*

court affirmed death sentences. *See State v. Young*, 459 S.E.2d 84, 88 (S.C. 1995) (murder committed during an armed robbery); *State v. Sims*, 405 S.E.2d 377, 379–80 (S.C. 1991) (double murder committed during an armed robbery of a Domino's Pizza); *State v. Thompson*, 292 S.E.2d 581, 583 (S.C. 1982) (murder committed during an armed robbery of a small grocery store), *overruled on other grounds by Torrence*, 406 S.E.2d 315.

For these reasons, the underlying ineffective assistance claim for this ground fails on the merits and Owens therefore cannot rely on *Martinez* to overcome the procedural default. Accordingly, he is not entitled to relief on Ground 12.

## IV.    Motion for Evidentiary Hearing

Owens requests an evidentiary hearing as to both his exhausted and unexhausted claims.

### A.    Exhausted claims

As to each of his five exhausted claims (Grounds 1–5), Owens asserts that there is "a genuine dispute of material fact that requires an evidentiary hearing on the merits." ECF No. 174 at 5, 55–56, 66, 76, 87. Under the AEDPA, evidentiary hearings on habeas petitions are generally limited. *See Cullen*, 563 U.S. at 181 ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). However, § 2254(e)(2) contains an exception to this general bar: "A petitioner who has diligently pursued his habeas corpus claim in state court is entitled to an evidentiary hearing in federal court, on facts not previously developed in the state court proceedings, if the facts alleged would entitle him to relief, and if he satisfies one of the six factors enumerated by the Supreme Court in *Townsend v.*

---

*Simpson*, 479 S.E.2d at 57; *Humphries*, 479 S.E.2d at 52.

*Sain*, 372 U.S. 293, 313 (1963)."[20]  *Conaway v. Polk*, 453 F.3d 567, 582 (4th Cir. 2006).

Here, the magistrate judge properly concluded that Owens "failed to identify what particular factual disputes he believes entitle him to a hearing," and he has not "identified any circumstances that would entitle him to an evidentiary hearing based on any of the above exceptions to the general prohibition on evidentiary hearings in federal habeas corpus cases." ECF No. 193 at 58.  The Court concludes that he is not entitled to an evidentiary hearing because, even assuming that he could meet at least one of the *Townsend* factors, he has not demonstrated that the facts alleged would entitle him to relief.  In evaluating his exhausted claims, the Court considered as true the facts he alleged, but for the reasons set forth above, those facts still did not entitle him to relief.  Accordingly, his request for an evidentiary hearing as to his exhausted claims is denied.

**B.  Unexhausted claims**

As to Owens' unexhausted *Martinez* claims (Grounds 6–10, 12),[21] he seeks to expand the record and requests an evidentiary hearing.  As the magistrate judge recognized, "a court may exercise its discretion to expand the record when considering whether cause and prejudice excuse

---

[20] The six *Townsend* factors are:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313.

[21] As discussed above, Owens now concedes that Ground 11 is not cognizable under *Martinez*. ECF No. 199 at 57.

a petitioner's defaulted claim." ECF No. 193 at 93 (citing *Fielder v. Stevenson*, No. 2:12-cv-00412-JMC, 2013 WL 593657, at *3 (D.S.C. Feb. 14, 2013)). Here, the magistrate judge exercised her discretion to expand the record and consider information not presented to the state court in determining whether *Martinez* excuses the procedural default of these claims. *Id.* at 94.

Though the magistrate judge expanded the record as Owens requested, for the reasons set forth above, he failed to establish a substantial claim of ineffective assistance of counsel as to each claim. As the magistrate judge noted, he had an ample opportunity to submit evidence in support of his claims, and he has done so.[22] The magistrate judge and this Court fully considered the evidence he submitted and took all of the new facts to be true, but concluded that he is not entitled to relief for the reasons set forth above. Accordingly, his request for an evidentiary hearing as to his unexhausted claims is denied.

## V. Motion to Stay

Owens filed a motion to stay this case pending the Supreme Court's consideration of the Fifth Circuit's decision in *Ayestas v. Stephens*, 817 F.3d 888 (5th Cir. 2016). ECF No. 186. That motion is now moot, as the Supreme Court issued its decision in that case on March 21, 2018.

---

[22] Owens implies that he is entitled to an evidentiary hearing because the affidavits that he submitted were not detailed enough. *See* ECF No. 199 at 46 ("[The affidavits] are not exhaustive of either credibility of the witnesses nor are they a complete statement of the evidence to be developed during an evidentiary hearing."). A party cannot submit threadbare affidavits and then use those inadequate affidavits to justify an evidentiary hearing. Here, the affidavits and documentation submitted were sufficient to evaluate his claims. *See Runningeagle v. Ryan*, 825 F.3d 970, 990 (9th Cir. 2016) ("Where documentary evidence provides a sufficient basis to decide a petition, the court is within its discretion to deny a full hearing."). Furthermore, as the magistrate judge recognized, an evidentiary hearing could only have weakened his petition because his witnesses would have been subject to vigorous cross-examination by the State, which may have called into question their opinions and factual statements. ECF No. 193 at 95 (citing *Runningeagle*, 825 F.3d at 990–91).

*Ayestas v. Davis*, 138 S. Ct. 1080 (2018).

The Supreme Court's decision has no impact on this case. There, the Court concluded that the district court applied the incorrect standard when it outright denied a federal habeas petitioner's request for service provider funding to assist with the litigation of his petition. *See id.* at 1095. In contrast, this Court authorized substantial service provider funding in order to allow Owens to fully litigate his habeas petition. *See* ECF No. 79 (ex parte order authorizing service provider funding). Accordingly, his motion for a stay is denied as moot.

## VI.    Conclusion

For the reasons stated, the R&R, ECF No. 193, is **ACCEPTED**, and Owens' objections to it, ECF No. 199, are **OVERRULED**. The State's motion for summary judgment, ECF No. 147, is **GRANTED**. Owens' amended petition for relief pursuant to § 2254, ECF No. 117, and motion for an evidentiary hearing, ECF No. 164, are **DENIED**. Owens' motion for a stay, ECF No. 186, is **DENIED AS MOOT**. This action is hereby **DISMISSED**.

The Court has reviewed this petition in accordance with Rule 11 of the Rules Governing Section 2254 Proceedings. In order for the Court to issue a certificate of appealability, Rule 11 requires that a petitioner satisfy the requirements of 28 U.S.C. § 2253(c)(2), which in turn requires the petitioner to make "a substantial showing of the denial of a constitutional right." The Court concludes that Owens has not made such a showing, and it is therefore not appropriate to issue a certificate of appealability as to the issues raised in this petition. He is advised that he may seek a certificate from the Fourth Circuit Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

s/ Terry L. Wooten

Terry L. Wooten
Chief United States District Judge

May 29, 2018
Columbia, South Carolina